[See the next following case, and also Smith v. Buchanan, *supra*, p. 277.]

WAGER ET AL. v. HALL.

1. The transfer by a debtor who is insolvent, of his property, or a considerable portion of it, to one creditor as a security for a pre-existing debt, without making any provision for an equal distribution of its proceeds to all his creditors, operates as a preference to such transferee, and must be taken as *primâ facie* evidence that a preference was intended, unless the debtor or transferee can show that the debtor was at the time ignorant of his insolvency, and that his affairs were such that he could reasonably expect to pay all his debts.
2. Such a transfer, if made within four months before the filing by the party of a petition in bankruptcy, is in fraud of the Bankrupt Act, and void.

APPEAL from the Circuit Court for the Western District of Wisconsin.

Hall, assignee of Lakin, a trader in Brodhead, Green County, Wisconsin, filed a bill in the court below against Wager & Fales, merchants, of Troy, New York, to set aside a mortgage on lands in the said Brodhead, given by the said bankrupt to them for $3000, to secure five payments, of $600 each, payable in six, twelve, sixteen, twenty, and twenty-four months, which mortgage and notes were executed December 15th, 1869, being twenty-four days prior to his filing his petition in bankruptcy, on the ground that it was given in violation of the Bankrupt Act. That act, in its 35th section, thus enacts:*

. "If any person, being insolvent, or in contemplation of insolvency, within four months before the filing of the petition by or against him, *with a view to give a preference* to any creditor or

---

* 14 Stat. at Large, 534.

person having a claim against him, . . . makes any . . . pledge, assignment, transfer, or conveyance of any part of his property, . . . absolutely or conditionally, the person receiving such : . . pledge, assignment, transfer, or conveyance, or to be benefited thereby, . . . having reasonable cause to believe such person is insolvent, and that such . . . pledge, assignment, or conveyance is made in fraud of the provisions of this act, the same shall be void, and the assignee may recover the property, or the value of it, from the person so receiving it, or so to be benefited."

The admitted case, stated favorably for the bankrupt, seemed to be thus:

Prior to 1854, Lakin was a clerk in Troy, and while there made the acquaintance of Fales (one of the defendants), who was a clerk at the same time. In 1854, Lakin went to Janesville, Wisconsin, and for two years worked as a clerk in a grocery store. Then he was in partnership with one Williston, in the grocery business, in Janesville, until the spring of 1858. Then he was a clerk for two years in Janesville and other places, during the last six months of which he was in the hardware store of one Richardson, of Janesville. In 1860 Richardson started a branch hardware store at Brodhead, about twenty miles west of Janesville, and put the same under the control of Lakin, who received half of the profits for his services.

After about sixteen months Lakin bought out Richardson, and continued a general hardware business at Brodhead, making purchases of stoves from a firm in Troy, which his former fellow-clerk at Troy, Fales, had formed with one Wager under the name of Wager & Fales. His sales in 1862 and 1863 were about $15,000 a year, and from 1864 to 1870 from $20,000 to $28,000 per year. His invoice of *goods* on hand, taken in 1864, was $10,393.67. His invoice of goods taken September 13th, 1865, was $8450.77. Soon after that he set agoing a branch store at Juda, near Brodhead, and his whole inventory, taken December 31st, 1867, was $23,978.97.

In February, 1868, he sold out his entire stock of stoves and tinware to Spaulding & Brown, of Brodhead, for $6000,

but continued to deal in hardware and agricultural implements.

Spaulding & Brown paid $2000 cash down, and for the balance gave their note of $4000, payable as fast as the stoves should be sold, and a considerable portion of this note remained unpaid January, 1870.

Up to April 1st, 1868, Lakin's stock was in a rented wooden building, and then being in fear of fire, he resolved to build a brick store, and for that purpose borrowed, *at that time*, on long time, $3000 of his father-in-law, Hayner, to be secured by mortgage on the store, and began to build the store on lots which he then owned. Hayner superintended the building of the store, and it was completed near the close of the same year, costing, aside from the lots, $8500.

Hayner resided in Brodhead from April 1st, 1868, to June, 1869, when he moved to Woodstock, Illinois, but he did not *receive his mortgage until August 27th,* 1869.

Lakin commenced buying stoves of Wager & Fales (whose mortgage it was now sought to set aside) as early as 1863, and continued to buy from $300 to $4000 per year from that time to and including 1867.

The debt for which Lakin gave the mortgage to Wager & Fales, was mostly for stoves purchased by him in 1867 at four months' credit. At the time of purchase it was agreed that Lakin should pay interest on all bills after maturity. Wager & Fales permitted the account to run until the notes and mortgage were given, he in the meantime making some small payments.

Lakin sold but few of the stoves bought of Wager & Fales during 1867, nor until he sold out his stove business to Spaulding & Brown; and the fact that he failed to realize on the stoves, and that he desired to build a new brick block during 1868, induced him to urge Wager & Fales to wait on him, and as their account was on interest, and there was nothing else to be done amicably, they consented.

When his store was completed, which was near the close of the year 1868, he found it had cost about double what he

had expected, and as he had not realized on the stoves, *he asked for further time, again promising to pay interest.*

On the 1st of February, 1869, Lakin wrote Wager & Fales hoping that they would "not get entirely out of patience with him or lose confidence in him," excusing himself for non-payment, and telling them that he had "a good stock of goods, in a good brick store, well insured, and was in a better and safer condition than ever before."

On the 4th of March, 1869, Lakin, having again excused himself for non-payment, and begged patience, after repeated requests for payment by Wager & Fales, who say they have already waited "very patiently," requested Wager & Fales to send him a statement of his account, and "several notes running as long a time as they could afford to let them, and that he would stamp, sign, and return them," and do his best to meet them when due. The matter rested in this way until one Johnson, who had for several years been the travelling agent of Wager & Fales, and was then their partner, came West and saw Lakin with a view of getting money from him. Lakin asked for more time. Johnson told him he would give him time, but if he gave him long time that he ought to give a mortgage on his real estate. Lakin was reluctant to give a mortgage, and stated that he was perfectly responsible, more so than when the debt was incurred, and that if his matters were closed up under the hammer, he would have $15,000 over and above his debts, and offered to turn out notes against other parties, three dollars to one, but said that the times were hard, and that he depended upon farmers for collection. The matter was left open at Lakin's special request and on his assurance that a mortgage would injure his credit, and on his promise to pay certain stipulated sums monthly.

After Johnson got home, and about September, 1869, he gave Wager & Fales a detailed account of his interview with Lakin, and told them that he considered Lakin honest and responsible, that he required some time to make him easy in his business matters, and that he thought it was their duty to accommodate him by giving him time, for the rea-

sons that he had bought a great many stoves of them, and paid them a great deal of money, and probably would again, and was partly a Trojan, and out of their friendship for him; and then if he would give a ten per cent. mortgage, *that* would close up the account on the books of the old firm of Wager & Fales, now about to be reconstituted, with him, Johnson, as a partner. In this Wager & Fales concurred.

The matter remained in that way until some time in October or November, 1869, when Wager & Fales sent the matter to Richardson to put in shape; the same Richardson already mentioned as the old principal of Lakin at Janesville, in 1860, and who was a friend as well of their own. Richardson and Lakin agreed upon terms, and Lakin was to get an abstract of title, execute the papers, and return them; but upon Richardson's submitting the proposition to Wager & Fales, they objected to certain portions of it, and Richardson informed Lakin that the matter must rest until he heard further from Wager & Fales. When he did hear, Lakin consented to their terms, and on the 15th of December, 1869, the mortgage and notes were given.

During the year 1869, including the last four months of that year, Lakin was in the habit of stating to all who questioned him in regard to his condition, that he was worth from $12,000 to $15,000 over and above his debts and liabilities.

So far as to the mortgage sought by this bill to be set aside.

Now as to the circumstances under which the petition in bankruptcy was filed.

About the 1st of September, 1869, that is to say, four months prior to filing it, Lakin owed a certain Nazro about $2400. During that four months Nazro sold him over $500 worth of goods, and Lakin paid him during the same time over $400. His last purchase was over $200, and made November 26th, 1869, and his last payment December 20th, 1869.

On the 26th of December, 1869, a friend of Lakin, residing at Brodhead, went to Woodstock with a letter which he

had just received from a friend in Chicago, saying that a report had been sent by some one in Brodhead to the *Mercantile Agency in Chicago,* that Lakin had made an assignment of his property to his father-in-law, Mr. Hayner. Lakin went to Janesville and told his attorney of the report, gave him what, according to his own account, he supposed, at the time, to be a true statement of his affairs, that he owed about $12,000 besides what he owed Hayner on the mortgage above mentioned, and that he had goods, notes, accounts, and real estate, which in his opinion were worth $28,000 or $30,000, and asked for advice. His attorney advised him to make a statement of his affairs to his creditors, ask them for an extension, if necessary; telling them there was no truth in the report of the assignment, and to get his friends to indorse for him; the attorney saying that thus he thought there would be no trouble in arranging matters. Almost immediately some of his creditors, including an agent of Nazro, came to Brodhead to investigate his concerns. He and Nazro's agent made a statement of his condition, and on December 27th or 28th, 1869, and after a considerable investigation, found that his debts were much larger than he had ever stated, and, as he alleged, much larger than he had ever supposed; being at least $23,000. Lakin then saw his attorney again, and told him how he had found matters, and was advised to send a full printed statement of his condition to each of his creditors. Lakin made and sent out such a statement, dated January 1st, 1870, and it showed his debts to be $26,447.73.

Lakin, then in company with Nazro's agent, again counselled with his attorney, who advised him that as Nazro was one of his largest creditors and a man of great business experience, he had better go to Milwaukee with the agent, and confer with Nazro, and he did so. Nazro then requested Lakin to go into voluntary bankruptcy. Lakin expressed a wish to do what was best for his creditors, but told Nazro he thought his creditors would get more money if they would select some one as assignee, and that he would turn over everything he had to such assignee for the benefit of

his creditors. Nazro told Lakin that the securities he had given stood in the way of that, and that unless he went into voluntary bankruptcy, he would himself file a petition and force him into bankruptcy. Lakin then saw his attorney, and filed his petition in bankruptcy January 8th, 1870.

Lakin's books were in a bad condition, and had been kept very loosely for years. The result was that his schedules in bankruptcy, dated February 2d, 1870, showed his debts to be $28,450.

Lakin's particular friend, Richardson, was on his paper during most of the last six months of the year 1869, and a company with which he was connected was a general creditor at the time of the failure. Lakin's father-in-law, Hayner, and his particular friend, Williston, were on his paper to a considerable amount at the bank at the time of his failure. A brother-in-law was a general creditor for $1083. Several of his most intimate friends were general creditors.

So far as to the admitted case.

1. To show that Lakin was at the time of giving the mortgage to Wager & Fales insolvent, and that he gave them the mortgage with a view to give them a preference over his other creditors, the assignee called five witnesses, whose evidence tended to show that for one or two years prior to the failure, Lakin had found it difficult to raise money to pay certain claims against him, and at times had been unable to do so and been protested; that he used moneys in his hands as treasurer of the school district, and also as treasurer of the church, and also moneys held by him in trust and in a fiduciary capacity, and that they and some others in Brodhead regarded him irresponsible, but that during the same time he was doing a business of from $15,000 to $30,000 per year, and pretended to be worth $20,000 over and above all his debts. Two of these witnesses had, during the time, reported him to mercantile agencies as insolvent.

To rebut this evidence, and to show that whatever might have been Lakin's actual condition, he never, prior to his failure, had any idea of stopping business, or being unable

to pay all his debts, or that the mortgage would operate as a preference to Wager & Fales, but that he gave the mortgage to obtain a long extension so that he would : ot have to crowd his own creditors, or sell property for less than it was worth to pay his debts, and that this extension would give him more money to use in his business and pay other debts, the defendants called nine witnesses, whose evidence in addition to the facts, as above stated, tended to show that Lakin as treasurer of the school district and the church received no compensation, but by a sort of consent of the board of trustees used the moneys as he pleased, they drawing on him for the amounts as they might desire to use it; that there was no defalcation with either.

2. To show that Wager & Fales at the time of receiving this mortgage had reasonable cause to believe that Lakin was insolvent, and that the mortgage was made in fraud of the provisions of the Bankrupt Act, the assignee called one witness. His evidence tended to show that he had had a conversation with the defendant, Wager, in November, 1869, in which Wager stated that he had made up his mind that Lakin was insolvent, but that the witness stated that he had recently been in Brodhead and that Lakin had assured him that he had property enough to pay all his debts, and he thought Lakin would pay dollar for dollar.

This testimony was contradicted by Wager.

In addition to this there was the positive evidence of six witnesses, that Lakin had all the time represented himself to be worth from $12,000 to $15,000 over and above his debts, and that they all believed it.

The court below decreed that the mortgage was fraudulent, and should be discharged of record. The defendants appealed to this court.

*Messrs. J. B. Cassady and W. Merill, for the appellant:*

1. Did Lakin make the mortgage *with a view* to give Wager & Fales a preference over his other creditors?

The words—"with a *view* to give a preference"—were selected and put in this clause of the statute because they express a thought—a condition of things which the clause

would not express without them, and hence they are not to be rendered insignificant by construction.

Lakin could not give a mortgage " with a *view* to give Wager & Fales a *preference* over his other creditors," without recognizing the fact, or in other words *knowing*, or at least *believing*, that he had not sufficient property to pay all his debts, and hence that in so far as he secured them in excess of their proportionate share of his estate, he would take from others a corresponding amount of their proportionate share of his estate, and thus prevent an equal distribution of his estate which in his mind—his view—*at the time* was less in value than the amount of his liabilities. A view to give a preference, therefore, as used in this clause, is nothing more nor less than a mental picture, a vision of an amount of indebtedness by the debtor exceeding the value of all his property, and a purpose to prevent an equal distribution by paying or securing some creditors at the expense of others. If Lakin had the picture in his mind—the vision—then he necessarily had some intent or belief as to the effect of giving the *mortgage*, and hence his intent or belief is in the question. The giving of a mortgage, or doing any other act by a debtor which would operate as a preference with such a picture in his mind, and with such a purpose, would establish an intent to give a preference.

But it is idle to talk about a man giving a mortgage with a view to give a preference to some of his creditors over others, when at the time of giving the mortgage he had no knowledge or belief that his property was less in value than the amount of his liabilities.

The case of *Jones* v. *Howland*,* a leading case in Massachusetts, seems to settle this case in our favor. That case, indeed, arose on section second of the Bankrupt Act of 1841. But a fair analysis of that section and of section thirty-five of the present bankrupt law, under which this case arises, will, we think, reveal the fact, that they mean to lay down essentially the same rule as to the *intent of the debtor*, and if this is so the authorities sustain our position.

---

* 8 Metcalf, 377, 386, 387.

In *Jones* v. *Howland* the court say:

" If a party who, *urs* or *believes* himself insolvent, but *does not* contemplate stoppage or failure, and *intends* to keep on, and make his payments, and transact his business, hoping that his affairs may be thereafter retrieved, and *in that state of mind* makes a sale or payment, without intending to give a preference, and as a measure connected with going on in his business, and not as a measure preparatory to, or connected with, a stoppage in business, such sale or payment is not void, as made in contemplation of bankruptcy, within the meaning of the second · section of the United States Bankrupt Act of 1841, though he *immediately* afterwards became bankrupt.

" It is said that a man must be supposed to intend the natural result of his act. But this remark, though often treated as an axiom, is by no means an infallible proposition. The result is not always evidence of the supposed intent. When we *look back upon events* that have happened, *we stand in a different position;* we behold with a clearer vision as we embrace within our glance the *beginning* and the *end,* the *act* and the *consequences.* But the man who is *doing the act* may contemplate a very different result. His judgment may be biassed by his wishes, and sanguine feelings may be the cause of overlooking difficulties, which to a more quiet temperament might appear insurmountable. Disappointments also may take place which were not anticipated. The experience of others is rarely a guide to an embarrassed man, and he goes on with the hope of relief, even against hope. To infer, therefore, a *design* to give a preference to a favored creditor, and in the immediate expectation of bankruptcy, from the mere fact of insolvency, is by no means a certain inference nor such as the jury would be necessarily bound to draw from the debtor's knowledge of his insolvency. The *evidence* must also go *further* and establish, as a *fact,* the *design* to give the preference—a fact too important to be left upon conjecture."

The court in the above opinion follows the best considered English cases;* and these cases have been adopted by this

* Fidgeon *v.* Sharpe, 5 Taunton, 545; Morgan *v.* Brundrett, 5 Barnewall & Adolphus, 297; Atkinson *v.* Brindall, 2 Bingham's New Cases, 225; Same Case, 2 Scott, 369; Hartshorn *v.* Slodden, 2 Bosanquet & Puller, 582; Gibbins *v.* Phillips, 7 Barnewall & Creswell, 529; Belcher *v.* Prittie, 10 Bingham, 408.

court as containing the "sounder rule."* Hence this court takes the same view as the court did in *Jones* v. *Howland.* The doctrine stated in that case has moroever been cited with approval or substantially followed in many of the Circuit and District Courts of the United States.

2. Did Wager & Fales, at the time of receiving the mortgage, have reasonable cause to believe that Lakin was insolvent?

There is no evidence that Wager & Fales had any knowledge that Lakin owed any debt except their own, and we submit, as a matter of law, that the mere fact that Wager & Fales held an account against Lakin which had been due nearly two years, under the circumstances stated, is not sufficient to establish as a matter of fact that they had reasonable cause to believe that he was insolvent.

3. Did Wager & Fales when they received the mortgage have reasonable cause to believe that Lakin made it in fraud of the provisions of the Bankrupt Act?

It is very evident that the question whether the mortgage was made by Lakin in fraud of the provisions of the Bankrupt Act, is entirely a different question from the one whether at the time he had the ability to pay his debts as they became due in the ordinary course of business; and for Wager & Fales to have reasonable cause to believe the one, is entirely a different question than for them to have reasonable cause to believe the other.

The evidence is overwhelming that Wager, Fales, Johnson, and Richardson were at the time of receiving the mortgage each and all convinced from what they knew in regard to Lakin, and what he had told them, that he was worth from $10,000 to $20,000, over and above his debts, and there is no evidence in the case tending to show that they had any reasonable cause to believe that he owed any considerable amount of debts aside from their own, much less that the amount of his debts was in excess or equal to the value of his property.

---

* Buckingham *v.* McLean, 13 Howard, 169–170.

Mr. Justice CLIFFORD delivered the opinion of the court.

Preferences as well as fraudulent conveyances, if made within four months before the filing of the petition by or against the bankrupt, are forbidden by the Bankrupt Act, but three things must be proved in order that the transaction may come within that prohibition and be affected by it as an illegal payment, security, or transfer: (1.) That the payment, pledge, assignment, transfer, or conveyance was made within four months before the filing of the petition by or against the bankrupt and with a view to give a preference to some one of his creditors, or to a person having a claim against him or who was under some liability on his account. (2.) That the person making the payment, pledge, assignment, transfer, or conveyance was insolvent or in contemplation of insolvency at the time the preference was given or secured. (3.) That the person receiving such payment, pledge, assignment, or conveyance, or to be benefited thereby, had reasonable cause to believe that the person making the payment or giving or securing such preference was insolvent, and that the payment, pledge, assignment, transfer, or conveyance was made in fraud of the provisions of the Bankrupt Act.*

On the 15th of December, 1869, the insolvent debtor named in the bill of complaint executed to the respondents a certain deed of mortgage of that date, of the following parcels of real estate, situate in the town of Brodhead in that State, and known as the north one-third of lot one in block one hundred and one, also all of lot three, in block one hundred and one, also the north half of the south half of block seventy-nine, also the east half and the southwest quarter of block two hundred and six, also all of block one hundred and forty-two, it appearing that all of these several parcels of real estate were conveyed by the insolvent debtor to secure the payment of five notes which he gave to the respondents, of the same date, payable to the respondents

---

* Scammon v. Cole, 5 National Bankruptcy Register, 259.

or order as follows: one for $600, payable in six months; one for $600, payable in twelve months; one for $600 payable in sixteen months; one for $600, payable in twenty months, and one for $600 payable in two years, and all with interest at the rate of 10 per cent.

Prior to that date, to wit, on the 27th of August of the same year, the insolvent debtor mortgaged the first-named parcel of real estate, which is his new brick store and lot, to Andrew P. Hayner, the father of his wife, to secure the payment of three notes of that date which he gave to the mortgagee, of the following tenor: one for $1287.87, payable in three years; one for $1000, payable in two years, and one for $1000, payable in three years, all with interest annually at the rate of 10 per cent.

Twenty-four days after he gave the mortgage to the respondents he filed his petition in bankruptcy, and on the 2d of February following he was adjudged a bankrupt. His creditors made an examination into his affairs soon after he gave the mortgage to the respondents, when it was made to appear that he was hopelessly insolvent, which induced him to make an effort to compromise with his creditors, but without any success, and he then filed the petition to be adjudged a bankrupt, and on the 4th of March in the same year the complainant was duly appointed the assignee in bankruptcy of his estate.

All of the notes secured by the mortgage to the respondents were given by the insolvent debtor for a debt which had been past due more than two years, and which the insolvent contracted for stoves purchased by him as stock in trade. His purchases were made on a credit of four months, and the record shows that the respondents, in repeated instances, called upon him for payment and had several times sent their agent to effect that object without much success. Small amounts were paid, but the insolvent debtor constantly asked for further indulgence, offering as a reason for his failure to meet his contracts that business was dull, and that it was impossible to collect what was due from his customers.

More than a year before the execution of this mortgage, he sold out his stock of stoves to other parties and abandoned that business, limiting his trade to that of a retail hardware merchant, and during that same year he built the new brick store which he mortgaged to his father-in-law three or four months before he gave the mortgage to the respondents.

Precisely what sum the store cost does not appear, but it must have been as much as $6000 or $8000, as the evidence shows that he owed more than $14,000 when he gave the mortgage in question, a large portion of which had been due for a long time.

Convincing evidence was also introduced showing that for a year or two he had been hard pressed for money by many of his creditors, and that his notes in repeated instances had been protested for non-payment, and it also appears that he had borrowed money at banks by means of indorsers and been obliged to get the same renewed, and he had used trust funds in his hands to pay pressing demands, and when called upon to repay the amount he was obliged to ask for delay.

Some of the notes given for the stock of stoves he had used to secure past-due debts and such portion of the consideration as had been paid he had expended in his business. Part of the money required to build the store, to wit, the sum of $3000, he borrowed of his wife's father, agreeing at the time to give him a mortgage of the premises when the store was completed, but the mortgage was not executed until the next season, and it appears that the respondents, when they heard of that mortgage through their agent, also demanded a similar security, which the insolvent debtor for a time refused to give, pleading as an excuse for declining the request that it would injure his credit. Witnesses were also examined to show that his credit was not in good repute, but it is unnecessary to enter into those details, as the proofs are of the most satisfactory character that he did not pay his debts when the obligations fell due and that he suffered his notes to go to protest.

Nothing need be added to show that the means of ascertaining the condition of his affairs were at hand, as his other

creditors, when they instituted inquiries upon the subject, shortly after the insolvent debtor gave the mortgage to the respondents, found no difficulty in learning that he owed more than the value of his property, and that he had been insolvent for two years. Enough, and more than enough has been remarked to show that the mortgagor was insolvent when he executed the mortgage to the respondents, as the fact is admitted both by the mortgagor and the mortgagees.

Preferences of one creditor over another are prohibited by the Bankrupt Act, if made within four months before the filing of the petition, and the complainant, as such assignee, prays that the mortgage may be declared fraudulent and void, and that the same may be decreed to be given up to be cancelled, or that the respondents may be required, in due form of law, to execute and deliver to him, as such assignee, a satisfaction, release, and discharge of the mortgage. Proofs were taken, and the parties having been heard, the Circuit Court entered a decree for the complainant, and the respondents appealed to this court.

Made, as the mortgage was, within twenty-four days next before the petition in bankruptcy was filed, and for the express purpose of securing to the respondents the payment of a large debt long overdue, the first material allegation to be proved may be considered, in view of the evidence already referred to, as fully established. Discussion to show that the effect of the mortgage was to secure a preference over all of the creditors of the bankrupt, except his wife's father and the firm secured by one of the notes given by the purchasers of the stoves, is unnecessary, as that proposition is self-evident; and the allegation that the mortgagor was insolvent at the time may also be considered established, as it is fully proved and stands confessed. Sufficient has also been remarked to show that the conveyance in mortgage was made with a view to give a preference to the respondents over all his other creditors, except such as he had previously secured in the modes previously explained.

Evidence of the most satisfactory character was introduced to show that the insolvent debtor had reasonable cause to believe that he was insolvent, and in view of all the circumstances the conclusion of the court is that he knew that he was insolvent in the sense of the Bankrupt Act. . Creditors were constantly pressing him for payment, and he was notoriously unable to comply with their just demands. Extensions were asked, which were sometimes granted and sometimes refused, and it appears that considerable of his paper went to protest. Such a conveyance, under such circumstances, could hardly be made by one deeply insolvent unless with a view to give the grantee a preference over other creditors, who were without any security, as the law authorizes the presumption that a person of ordinary intelligence intends what is the necessary and unavoidable consequence of his acts.

Insolvency, as used in the Bankrupt Act, when applied to traders, does not mean an absolute inability of the debtor to pay his debts at some future time, upon a settlement and winding up of his affairs, but a present inability to pay in the ordinary course of his business, or, in other words, that a trader is insolvent when he cannot pay his debts in the ordinary course of business as men in trade usually do, and such must be the conclusion, even though his inability be not so great as to compel him to stop business.*

Reference is made by the respondents to the case of *Jones* v. *Howland*,† which it is insisted lays down a different rule. Suppose it be admitted that the opinion in that case affords some support to the suggestion, still it is only an apparent inconsistency, which is easily reconciled, as the case arose upon the prior Bankrupt Act, which did not declare such a conveyance void, unless it was *made in contemplation* of bankruptcy *and for the purpose* of giving the creditor a preference or priority over the other creditors of the bankrupt.‡ What was said by the judge who gave the opinion in that case,

---

* Vennard *v.* McConnell, 11 Allen, 562; Thompson *v.* Thompson, 4 Cushing, 134; Barnard *v.* Crosby, 6 Allen, 331.

† 8 Metcalf, 377–385.                    ‡ 5 Stat. at Large, 442.

which is supposed to be inconsistent with the more recent opinions of the court upon the same general subject, was said in construing the provision referred to in the prior law. He did say in that case that if the debtor honestly believes he shall be able to go on in his business, and with such belief pays a just debt without a design to give a preference, such payment is not fraudulent though bankruptcy should afterwards ensue; but the judge admitted in the same case that if the debtor, being insolvent and *knowing his situation* and expecting to stop payment, shall then make a payment or give security to a creditor for a just debt, with a view to give him a preference over other creditors, such payment or giving security is fraudulent. But the present Bankrupt Act avoids a conveyance, made with a view to give a preference, if the debtor at the time be in fact insolvent, although he may not contemplate bankruptcy in connection with the conveyance.* Such a conveyance, *if made by a person actually insolvent* or in contemplation of insolvency, to secure a pre-existing debt, said Hoar, J., "may be avoided by the assignee if the mortgagee had reasonable cause to believe him insolvent at the time he took the mortgage, and that the conveyance was made to impede the operation of the insolvent laws;" and he added that it is made *primâ facie* evidence of such cause of belief if the conveyance is not made in the usual and ordinary course of business of the debtor.†

Nothing remains, therefore, to be re-examined except the issue whether the respondents had reasonable cause to believe that the mortgagor was insolvent and that the conveyance was made in fraud of the provisions of the Bankrupt Act. Proof that the respondents had actual knowledge that the mortgagor was insolvent at that time is not required to support the prayer for relief, but the allegation in that behalf is sustained if it appears that they had reasonable cause for such belief, as that is the language of the Bankrupt Act. Actual knowledge of the alleged fact is not made the criterion of proof in such an issue, nor is it necessary that it

---

* Forbes *v.* Howe, 102 Massachusetts, 435.

† Nary *v.* Merrill, 8 Allen, 452.

should appear that the respondents actually believed that the mortgagor was insolvent, but the true inquiry is whether they, as business' men, acting with ordinary prudence, sagacity, and discretion, had reasonable cause to believe that the debtor was insolvent, in view of all the facts and circumstances known to them at the time the conveyance was made.* Unless the debtor was in fact insolvent it cannot be held that such a grantee had reasonable cause to believe the allegation, but if it appears that the debtor was in fact insolvent as alleged, and that the means of knowledge were at hand, and that such facts and circumstances were known to the grantee as were clearly sufficient to put a person of ordinary prudence and discretion upon inquiry, it is well settled that it would be his duty to make all such reasonable inquiries to ascertain the true state of the case. Purchasers are required to exercise ordinary prudence in respect to the title of the seller, and if they fail to investigate when put upon inquiry, they are chargeable with all the knowledge which it is reasonable to suppose they would have acquired if they had performed their duty in that regard.† Creditors have reasonable cause to believe that a debtor, who is a trader, is insolvent when such a state of facts is brought to their notice respecting the affairs and pecuniary condition of the debtor as would lead a prudent business man to the conclusion that he is unable to meet his obligations as they mature in the ordinary course of business.‡ All experience shows that positive proof of fraudulent acts, between debtor and creditor, is not generally to be expected, and it is for that reason, among others, that the law allows in such controversies a resort to circumstances as the means of ascertaining the truth, and the rule of evidence is well settled that circumstances altogether inconclusive, if separately considered, may by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to

---

* Coburn *v.* Proctor, 15 Gray, 38.

† Tiffany *v.* Lucas, 15 Wallace, 410; Scammon *v.* Cole, 5 National Bankruptcy Register, 263.

‡ Toof *v.* Martin, 13 Wallace, 40.

constitute conclusive proof, which is a rule clearly applicable to the facts and circumstances disclosed in this record.*

Apply those two rules to the present case and it may well be said that the argument is concluded, as it is difficult to resist the conclusion that the respondents had *actual knowledge* that "the insolvent debtor was unable to meet his obligations as they matured in the ordinary course of his business."† Such proof, however, is not required, as the only issue in this behalf is whether the respondents had reasonable cause to believe that the debtor was insolvent at the time they received the conveyance, testing the question under the rule prescribed by this court.‡

Much discussion of the question whether the respondents had reasonable cause to believe that the conveyance was made in fraud of the Bankrupt Act may well be omitted, as the whole issue is substantially adjudged by the recent decision of this court, which is to the effect following: that the transfer by a debtor who is insolvent of his property, or a considerable portion of it, to one creditor as a security for a pre-existing debt, without making any provision for an equal distribution of its proceeds to all his creditors, operates as a preference to such transferee and must be taken as *primâ facie* evidence that a preference was intended, unless the debtor or transferee can show that the debtor was at the time ignorant of his insolvency, and that his affairs were such that he could reasonably expect to pay all his debts; and that a transfer by an insolvent debtor of his property, or any considerable portion of it, with a view to secure it to one creditor, and thus prevent an equal distribution among all his creditors, is a transfer in fraud of the Bankrupt Act.§

Knowledge of a given fact may be proved by circumstances, even in an ordinary equity suit, where, from the nature of the pleadings, the testimony of a single witness

---

* Castle *v.* Bullard, 23 Howard, 187.    † Toof *v.* Martin, 13 Wallace, 40.
‡ Coburn *v.* Proctor, 15 Gray, 38.
§ Toof *v.* Martin, 13 Wallace, 40; Nary *v.* Merrill, 8 Allen, 452; Metcalf *v.* Munson, 10 Id. 491; Scammon *v.* Cole, 5 National Bankruptcy Register, 269.

without corroboration would not be sufficient to establish the alleged fact, and if so it cannot be doubted that circumstances in a case like the present are sufficient to put the respondents upon inquiry, or even to show that they had reasonable cause to believe the alleged fact, that the conveyance was made in fraud of the Bankrupt Act. Their debt had been overdue for two years, and throughout that period they had pressed the insolvent debtor for payment, both in person and through their agent, and it is not doubted that if they had made the least inquiry they would have been as successful as his other creditors were, a few days later, in ascertaining that he was hopelessly insolvent. Beyond doubt they knew that he had mortgaged his new brick store and lot to his wife's father, and when he finally consented to give them a mortgage on all or nearly all of his real estate, they were fairly put upon inquiry, and having neglected to make such they are justly chargeable with all the knowledge it is reasonable to suppose they would have acquired if they had performed their duty as required by law.

Decree affirmed.