**BARNSDALL OIL CO. et al. v. WILLIS et al.**

No. 11265.

Circuit Court of Appeals, Fifth Circuit.

Jan. 12, 1946.

---

Richard L. Arnold, of Texarkana, Ark., and Foster V. Phipps, of Tulsa, Okla., for appellants.

Elmer L. Lincoln and J. I. Wheeler, both of Texarkana, Tex., and Frank S. Quinn and Herbert M. Barney, both of Texarkana, Ark., for appellees.

Before SIBLEY, McCORD, and WALLER, Circuit Judges.

WALLER, Circuit Judge.

Appellant, J. K. Wadley, in attempting to secure additional oil and gas leases in the Eylau area of Bowie County, Texas, secured the services of A. L. Willis, as his agent or broker from time to time during the year 1943, to buy certain specified oil leases, for which Mr. Willis was compensated by commission, generally, of fifty cents an acre. Willis purchased ten leases in the area for Wadley on the above basis, eight of which were acquired during the month of July, 1943—one having been secured in January. During 1943 Willis was engaged in buying leases for others in Miller County, Arkansas, and his employment by Wadley was special, that is, it was only for the purpose of procuring leases from certain parties and within certain price limits. He was not a general, or full-time employee, nor was he restricted by any express agreement from acting as a broker for whomsoever he chose. From time to time until approximately September 28, 1943, he bought designated leases for Wadley, who was under contract to assign all leases obtained in the area to Barnsdall Oil Company and Standard Oil Company, the other Appellants.

In the center of the tract which Wadley was undertaking to block up there was a tract of 91 acres belonging to Louis Heilbron. Mr. Wadley believed that a lease on this land was owned by the Texas Company and, therefore, did not commission Mr. Willis to acquire it until August 12, 1943. Some years before Willis had bought a lease on these lands for the Phillips Petroleum Company. He knew in June that Mr. Wadley believed this land was under lease to the Texas Company. On July 20, 1943, Mr. Willis, while in the office of the Phillips Petroleum Company, at Shreveport, made inquiry and learned that Phillips had recently allowed the Heilbron lease to lapse. Willis promptly returned to Texarkana and on the next day bought the lease from Heilbron for himself, but in the name of A. T. Brown, a brother-in-law, who lived in Dallas. On August 31, Willis wrote a letter in the name of A. T. Brown and mailed it at Longview, whereby he transmitted this lease to the Clerk at Texarkana for recordation.

On August 12, Mr. Valerius, a geologist in the employ of Barnsdall Oil Company,

one of the Appellants, who was looking after Mr. Wadley's matters while the latter was in California, found that the Phillips lease on the Heilbron land was no longer in effect and on the same day engaged Mr. Willis to obtain a lease on this land. Notwithstanding the fact that Willis was then the owner of the lease, he failed to inform the Plaintiffs that he was such owner and agreed to undertake to get it for Wadley. For some time Willis pretended that he was unable to obtain definite information as to the owner of the lease, meanwhile holding his lease off the record until September 1. After recording his lease in the name of A. T. Brown, he claimed to be unable to locate A. T. Brown, and at one time advanced the information that Brown was a "jack-leg lawyer" who had once lived in Longview, Texas, but later had moved away. He once reported that there were four people interested in this lease. Later he advised that the lease was the property of A. T. Brown and O. R. Davis, and that they wanted $5,000, plus ¼ of the ⅞ overriding royalty. This proposition not having been accepted promptly, the price, in a short while, was raised $2,000. In the end the Plaintiffs paid Willis $7,500 for the lease with the ¼ of ⅞ over-riding royalty retained by him. O. R. Davis was another brother-in-law of Mr. Willis, but neither he nor Brown ever had any interest in the lease. In addition to paying Willis $7,500 for his lease, Plaintiffs, not having discovered the deception, also paid him $500 as a commission for buying the lease from himself.

The complaint alleged that Willis, while agent for Wadley, was told that he was undertaking to block up the leases in the Eylau area; that he was shown a map of the area on which the leases belonging to the Plaintiffs were delineated; that he knew that geophysical tests were being made and the results thereof; and that thus he became familiar with the "areas of mutual interest"; and that he knew that the Heilbron lease was in the center of the area which the Plaintiffs were seeking to block up and that they intended to drill in the area; that Willis, having gotten this confidential information by virtue of his employment, unfaithfully took advantage of the same and purchased the Heilbron lease in his own name, to his own profit and advantage, and to the great detriment of Plaintiffs; that Willis collected a commission of $500 for buying the lease from himself; and that in law and in good conscience he should be stripped of all profit obtained by virtue of his breach of faith and confidence.

Willis asserted that he was informed that Mr. Wadley was only undertaking to checkerboard the area, that is, to get leases located in spots scattered about through the area, and that he was never informed that Wadley desired to get all the area into a block; that he was employed only for the acquisition of specific leases; that he obtained no confidential information from such employment but that any information that he had was public information, available to anyone interested; he denied all allegations of breach of faith and asserted that he had the right to acquire the lease in the absence of any information that the Plaintiffs desired to acquire it, or in the absence of any instruction to purchase it for the Plaintiffs. He admitted that he had acquired the lease and that he had concealed his ownership of it from the Plaintiffs, saying: "I didn't want nobody to know I had it; I wanted to keep it to see if it would turn out and make me some money."

The record in this case is distinctive in that it has findings of fact and conclusions of law consuming 203 of the 550-page record and 723 remarks by the Court in the other 281 pages of the record consumed in the trial.

The 203 pages of findings of fact and conclusions of law culminate in the fact that the Judge chose to believe the man who admitted that he lied to, and deceived, his quondam employer, and who had extracted a $500 commission for buying a lease from himself, and to disregard the testimony of witnesses Wadley and Valerius whose verity has no such damaging admissions against it. The adage "Falsus in uno, falsus in omnibus," seems to have met with small favor with the lower Court.

From a decree denying any recovery, Plaintiffs appealed.

The Plaintiffs contend that Willis was an agent of Wadley and under a duty not to use, in competition with his principal confidential information which the agent necessarily acquired during the course of the agency; that Willis, by virtue of his agency, was well informed that the Plaintiffs were having geophysical tests for oil made of the area and that Mr. Wadley had already acquired numerous leases in the area; that Willis had seen Wadley's map of the area showing the ownership of land and the oil leases of the Plaintiffs and had ascertained that Heilbron's land was in the

center; that he was told by Wadley of these facts, but even if he had not been expressly informed by Wadley of the facts, nevertheless, Willis, by virtue of his relation and by the work which he had done for Plaintiffs, learned that Wadley and those connected with him were making geophysical tests and were vitally interested in that area, and were attempting to block up the leases for the putting down of test wells, which wells would be made around the first of the year; that the withholding by Plaintiffs of their leases from the public records and the large number of leases that they were obtaining were all known to Willis, who took advantage of this information to acquire the Heilbron lease in the center of the tract for his own enrichment and to the serious injury of his said principal.

The lower Court thought:

(1) That Willis had violated no fiduciary duty to the Plaintiffs.

(2) That Willis was not employed by Wadley to aid in completing the filling of the Eylau block and the acquisition of the leases necessary for this purpose.

(3) That Willis was not in a fiduciary relationship to Wadley at the time he acquired the Heilbron lease of July 21, 1943, and was not then under the duty to assist Wadley in completing the acquisition of desired leases in the Eylau block.

(4) That the Plaintiffs were not entitled to recover the $7,500 paid to Willis, nor the ¼ of ⅞ over-ride, less the $291 paid by Willis for the lease, nor were the Plaintiffs entitled to recover the $500 commission which they had paid Willis for buying the Heilbron lease from himself.

(5) That Wadley only showed Willis a checkerboard map of the area and that "prior to July 21, 1943, and August 12, 1943, he never had any contractual relation with Wadley or the Barnsdall Oil Company or Standard Oil Company of Ohio to work for them as their agent, and I find that the evidence does not prove that he did."

Although the District Judge did not make it plain in his conclusions of law, at the end of the trial, nevertheless, he evidently entertained the view throughout that one who was employed as a broker to acquire specific leases for which he was paid a commission in the event he succeeded in acquiring such leases only as he was requested to secure was not such an agent as owed any fidelity or duty to his principal except in relation to the particular leases assigned to him for acquisition, for during the trial the District Judge made the following, and similar, observations on several occasions:

"Suppose he did ask him to get it (sic., the lease), and he went and got it and turned it over to somebody else. I don't see what you can do about that." (R. 306)

"I am just telling you the way I understand the law. It might not be considered good morals and things like that, but if you go to a man and tell him that you would like for him to get such and such a lease, and he turns it over to you and you don't pay him or make him your agent in doing that so as to bind him, and he goes and gets it and turns it to somebody else, I don't see any recourse here." (R.307)

"So this word 'employment', I don't take that to mean employment. He finds out you want a lease and if he gets it you pay him a commission of five per cent and if he don't get it, you don't pay him a commission. I don't call that employment." (R. 341)

"I don't think just because a man goes around here and he went down here on the Moore place to get a lease, another lease and he told him he was getting leases for the oil company, he knew who they were going to, that that makes him an agent of theirs or an employee of theirs." (R. 482)

The foregoing statements indicate the view that the Court continuously entertained and which doubtless influenced the finding of fact and conclusion of law appearing on page 250 of the record:

"Willis testified that the map that Wadley showed him indicated a checkerboard map *and that prior to July 21, 1943 and August 12, 1943, he never had any contractual relation with Wadley or the Barnsdall Oil Company or Standard Oil Company of Ohio to work for them as their agent* and I find that the evidence does not prove that he did." (Emphasis added)

The statement of the lower Court that the evidence does not prove that Willis ever "had any contractual relation with Wadley or the Barnsdall Oil Company or Standard Oil Company of Ohio to work for them as their agent" prior to July 21, 1943, and August 12, 1943, is totally at war with admitted facts and the District Judge must have thought that the special employment of Willis to acquire certain leases between January 1 and August 12, 1943, did not establish any contractual relation with Wadley or the oil companies such as would constitute him as their agent. Such a conclusion of law would be erroneous.

While the arrangement to have Willis acquire specific leases did not make him a general agent of Wadley, beyond question he was a special agent, or broker, for the purpose of obtaining the leases which he was engaged to acquire. The Court below evidently believed that such arrangement *could* create no fiduciary relation between Willis and Wadley. This conclusion is not necessarily correct, for if any broker or agent, be he general or special, acquires confidential information from his principal which he would not have acquired had he not been such agent, he cannot use the information so acquired to the injury of his principal. The question is not the length of time that an agent is employed by his principal. It is not the amount of money paid by the principal to the agent, but it is the fact that the law prohibits a broker from turning to his own selfish and private advantage, and to the detriment of his principal, confidential information which came to him out of the relation of principal and agent.

The failure to recognize this special agency evidently led the lower Court into the error of concluding that prior to July 21, 1943, Willis had no contractual relation with Wadley or the other Plaintiffs to work for them as their agent, for it cannot be said that Willis was not the special agent or broker of the Plaintiffs prior to July 21, 1943, or August 12, 1943. It is admitted that Willis on frequent occasions before these dates served as Wadley's broker in acquiring leases.

A broker is a special agent and has the same duty toward his employer as a special agent. 7 Tex.Jur. 386, §§ 1 and 2.

"A broker is a fiduciary required to exercise fidelity and good faith toward his principal in all matters within the scope of his employment. He cannot put himself in a position antagonistic to his principal's interest. This requirement not only forbids conduct on the part of the broker which is fraudulent or adverse to his client's interests, but also imposes upon him the positive duty of communicating all information he may possess or acquire which is, or may be, material to his employer's advantage. Standing in the place of and representing, his employer, a broker is bound to discard every feeling of friendship, to know no self-interest, and to act as he judges the interest of his employer would induce the latter to act if he were present." 8 Am.Jur. 1035, § 86.

"The duty of good faith which a broker owes to his employer incapacitates him from acting in behalf of his employer if, unknown to the latter, he has a secret personal interest in the discharge of his agency which is adverse to that of his principal. The law does not permit him to advance his own personal interests by discharging the duties of his position in such a manner as to make a secret profit for himself." 8 Am.Jur. 1037, § 88.

"The general rule is that a broker can neither purchase from, nor sell to, his principal unless the latter expressly assents thereto or, with full knowledge of all the facts and circumstances, acquiesces in such a course. The reason is that it is inconsistent for one to act as principal in his own behalf while in duty bound to act as the agent of another, for in the latter capacity he is bound to exercise his best skill and labor and a high degree of fidelity and good faith to secure for his principal the best bargain possible, even though his own conflicting interests at the same time impel him to do just the opposite and thereby gain the most advantageous terms for himself." 8 Am.Jur. 1039, § 91.

"A broker's contract of employment is one of the class calling for the utmost good faith (uberrima fides) on the part of the broker. * * * Furthermore, he is bound to disclose to his employer all material facts within his knowledge affecting the transaction. * * *." 7 Tex.Jur. 433, § 45.

"In addition to forfeiture of his right to commission, the broker may become liable to his principal for any negligent or other wrongful act done by him whereby his employer suffers damage." 7 Tex.Jur. 402, § 21.

The Court found as a matter of fact: (1) That Wadley had never disclosed to Willis any results of the geophysical survey; (2) that Willis did not have knowledge of the contents of the agreement between Wadley, Barnsdall Oil Company, and Standard Oil Company of Ohio prior to July 21, 1943; (3) that no statement was made to Willis by any complainant that they were getting leases for a contiguous block in the Eylau area for development; (4) that Willis was never the general employee, or in any sense a trustee, of Wadley; (5) the evidence is not sufficient to prove that Willis ever specifically examined a map and had ascertained therefrom what specific holding or holdings the complain-

ants had in that field; (6) that neither Plaintiff ever told Willis that they were blocking up the area for development and wanted to acquire the entire block; (7) that Wadley never explained to Willis before the latter acquired the Heilbron lease that he wanted it or wanted Willis to acquire it for him. It is impossible to determine what effect the erroneous conclusion as to the lack of agency and as to the duty of the special agent or broker had upon the Court in making its findings.

The testimony of Willis, which the court accepted, is contradicted by that of Wadley, and in parts by other witnesses. His concealment of his connection with the Heilbron lease tends to his discredit. If he in truth had no confidential information concerning the value and desirability of this lease at the time he bought it, derived from his previous activities as plaintiffs' agent to purchase other leases, such concealment would not itself make him a trustee of the Heilbron lease and may not have damaged his principals when they bought it from him at a price which they agreed to pay, making no offer to rescind on discovery of the truth. Compare Kilbourne v. Sunderland, 130 U.S. 505, at page 517, 9 S.Ct. 594, 32 L.Ed. 1005, as to Square No. 115. But the factual question as to whether Willis obtained confidential information out of his special agency is controlling, and it is clear that Willis, after accepting the duty of buying the Heilbron lease, could not charge a commission for buying it secretly from himself. We think a more careful retrial should be had in the light of the principles we have announced. The judgment is reversed and the cause remanded for such new trial.

Reversed and remanded.