**HUNTER et al. v. SHELL OIL CO.**

No. 13082.

United States Court of Appeals
Fifth Circuit.

July 31, 1952.

---

486

John W. Stayton, Charles L. Black, Austin, Tex., for appellant.

Dan Moody, Austin, Tex., R. H. Whilden, Barksdale Stevens, Fred L. Williams, Houston, Tex., William F. Kenney, New York City, N. Y., for appellee.

Before HUTCHESON, Chief Judge, and HOLMES and STRUM, Circuit Judges.

STRUM, Circuit Judge.

This appeal presents for review a judgment for the plaintiff in two consolidated suits instituted by Shell Oil Company against Paul B. Hunter, and others, to impress constructive trusts upon certain royalty interests, mineral interests and leasehold estates in oil, gas and other minerals, acquired by them in the circumstances hereinafter mentioned.[1]

1. For simplicity, these various interests will hereafter be referred to non-technically as "mineral interests."

■ From 1930 to 1941, when he was discharged, the defendant-Hunter was employed by Shell Oil Company as senior geologist in its Houston office, where he was in direct charge of Shell's extensive exploration activities in a large area along the Gulf coast of Texas and Louisiana. Hunter's principal duties were to collect geological and geophysical information for use by Shell and to advise the company where to purchase oil and gas interests, where to drill test wells, and the like, for which purpose he was employed and paid full time. This information was highly confidential. Hunter's relationship with Shell was of a fiduciary nature, in which the utmost good faith is mandatory. At all times during Hunter's employment, Shell had a rule prohibiting its employees from acquiring royalty and other mineral interests. This rule applied to Hunter, and he was aware of it.

Early in 1941, Shell discovered that Hunter had been unauthorizedly divulging confidential information to one A. M. Joncas, one R. J. St. Germain, and to Southland Royalty Company, based upon which, and acting in numerous instances through the hereinafter mentioned corporations for concealment, they bought up royalty and other interests in oil lands discovered by Hunter in Texas, Louisiana and Arkansas, for which Hunter received, as his compensation for furnishing said information, fractional participations in their purchases.[2] Sometimes these participation interests were taken by Hunter directly in his own name, sometimes under an alias, and in some instances through interests in some of the corporations involved. The company immediately discharged Hunter, and soon thereafter instituted these suits against him and some of those acting in concert with him in buying up mineral interests based upon Hunter's information. In its complaint, Shell prayed that each defendant be required to account for each of the interests so acquired by him, and that they be required to convey to Shell such of said interests as Shell should elect to recover, such conveyance to be conditioned upon Shell reimbursing defendants for the costs to them of such mineral interests.

Shell asserts that by disclosing such confidential information, which was its exclusive property, and in aiding his associates[3] to acquire the above mentioned mineral interests, Hunter breached his fiduciary duty to his employer; placed himself in a position where his personal interests conflicted with those of his employer; and that in consequence Hunter and the persons and corporations who acquired mineral interests through his unauthorized disclosures, hold such interests as constructive trustees for Shell.

After a trial with an advisory jury, extending over a period of five months, the trial court found for the plaintiff as to 59 of the areas involved, and for the defendants as to 15 other areas,[4] holding that

---

2. In all, Hunter received 549 separate interests under 373 properties in 83 separate areas, in the states of Texas, Arkansas and Louisiana.

3. These were a Canadian citizen residing in Houston, Texas, named A. M. Joncas; one R. J. St. Germain, who was engaged in buying mineral interests in Texas, Louisiana and Arkansas; B. S. Parkinson, who was the manager of three Canadian corporations, Interstate Royalty Corporation, Second Interstate Royalty Corporation, and Franco-American Securities, organized by Joncas and Parkinson to deal in mineral interests and securities, also John D. Kelley, Vice-President of Rotex Oil Company, hereinafter mentioned, and Southland Royalty Company, a firm dealing in mineral interests

in Texas and Louisiana. Neither St. Germain, Parkinson, nor Southland Royalty Company were made defendants. All the others above named were made defendants, however, as were also Rotex Oil Company, a Delaware corporation organized in July, 1938, by Hunter and Joncas to buy up and deal in mineral interests, Montex Petroleum Corporation, a Delaware corporation, and Glenora Oil Company, a Texas corporation, organized by Joncas for the same purpose, dominated and largely owned by Joncas and Parkinson, with Joncas in active charge of their affairs.

4. The advisory jury found that Hunter had given unauthorized information to Joncas and others as to 58 designated areas, but not as to 18 other areas. To said 58

mineral interests in the 59 areas had been purchased by Hunter's associates through unauthorized information furnished by Hunter in breach of his fiduciary duty to his employer, Shell Oil Company.[5] The trial court also found that the individual defendants knowingly accepted the benefits of these unauthorized disclosures, and aided Hunter in concealing them from his employer.

Judgment was thereafter entered impressing trusts upon the interests acquired by the defendants in the 59 areas, as well as upon Hunter's 1/4 stock ownership in Rotex Company. The defendants were also required to convey to Shell all such interests as were still held by them, and which Shell elects to recover in kind, conditioned upon Shell reimbursing defendants for the original cost of such interests. The judgment further authorized the pursuit and recapture by Shell, on the same terms, of such interests as may have been conveyed by defendants to *non* bona fide purchasers, or at its election to have a judgment against the seller-defendant for the sale price, or for the reasonable market value thereof, and to recover the purchase price or market value of interests sold to bona fide purchasers.

Following a lengthy period of accounting, money judgments were also entered against certain of the defendants in the aggregate sum of $130,378.92,[6] representing income and other money accruals from their ostensible ownership of the interests upon which trusts were impressed, some of which had been sold by defendants to bona fide purchasers.

Appellants question the existence of federal jurisdiction because of the admixture of citizens and aliens as parties defendants. In each case, plaintiff Shell Oil Company is a citizen of Virginia; some of the defendants are citizens of states other than Virginia, while all other defendants are aliens, citizens of Canada. Appellants assert that this does not accord with diversity jurisdiction as defined in Art. 3, Sec. 2, U. S. Constitution, contending that to satisfy this provision the defendants must be either all citizens or all aliens. This court has approved the well established doctrine that federal courts have jurisdiction of suits brought, as here, by a citizen of one state against a citizen of another state and an alien, as joint defendants. W. H. Goff Co. v. Lamborn & Co., 5 Cir., 281 F. 613, text 616. See also Roberts v. Pac. & A. Ry. & Nav. Co., 9 Cir., 121 F. 785. Federal jurisdiction clearly exists.

An agent may trade for his own benefit outside the scope of his principal's business without being accountable for the profits realized. But he is forbidden to deal with a subject matter of the agency, or to use for his own advantage information acquired while acting within the scope of the agency. Nor may an agent put himself in a position in which his personal

---

areas the trial judge added one more (Wasson), making 59. To the 13 areas as to which the jury found that no unauthorized information was given, the trial judge added two others (the Hull and Silk area and the Yarborough and Allen Ranch area), making 15 areas which were exonerated.

5. The trial court said: " * * * that he (Hunter) repeatedly, systematically, and secretly breached this duty to Shell, not only by acquiring oil and gas leases and royalty for himself, in conflict with his duties to Shell, but, in addition thereto, by imparting, for pay, to others associated with him, to-wit: Joncas, St. Germain and Southland Royalty Company, valuable confidential information which was the exclusive property of the Shell Company, as well as giving geolog-

ical advice to said parties, which necessarily utilized such information. That in so doing, he, the said defendant-Hunter, acted within the scope of his agency by reason of his employment by plaintiff, and without the knowledge and consent of said Shell, for his own personal interest and for the interests of those in league with him, and contrary to the interests of his employer, the plaintiff-Shell."

6. These judgments were against—

| | |
|---|---|
| Hunter | $ 45,517.45 |
| Rotex | $ 24,086.06 |
| Montex | $ 8,087.32 |
| Interstate | $ 14,901.24 |
| Franco-American | $ 4,038.84 |
| Glenora | $ 33,748.01 |
| Total | $130,378.92 |

interests may come into conflict with his duty to his principal, or which may afford him an opportunity to subordinate the interests of his employer to his own individual benefit while discharging his duties. Such conduct is not only morally wrong, it is contrary to public policy. When property has thus been wrongfully acquired, equity converts the holder into a trustee, and compels him to account for all gains from such conduct. Pratt v. Shell Petroleum Co., 10 Cir., 100 F.2d 833, and cases cited text pages 836, 837; Ohio Oil Co. v. Sharp, 10 Cir., 135 F.2d 303; Russell v. Republic Production Co., 5 Cir., 112 F.2d 663; Barnsdall Oil Co. v. Willis, 5 Cir., 152 F.2d 824; idem., 153 F.2d 784; Trice v. Comstock, 8 Cir., 121 F. 620, 622–623, 61 L.R.A. 176; 2 Restatement Law of Agency, p. 893.

■ Appellants contend that Shell deals only in leasehold interests, not in royalty or mineral interests, and that it was error to impress trusts upon royalty and mineral interests purchased by Joncas on Hunter's advice, because, as to these, neither Hunter nor Joncas were in competition with Shell. But the evidence is to the contrary. It appears that from 1922 to 1941, Shell purchased royalty or mineral interests in 80 areas along the Gulf coast, for which it paid $510,000. Of this, $350,000 was spent during the period of Hunter's employment. Appellants dispose of this with the observation that since Shell invested millions of dollars every year in leases, this sum of $350,000 "was insignificant, * * * a mere drop in the bucket." But even in these days of astronomical figures, such a sum can not be so casually brushed aside. It is a substantial sum, and Hunter's relationship with Shell was one in which the most perfect good faith was required,—a relationship *uberrima fides*.

We are in accord with the trial court's findings and judgment. Generally speaking, the breach by Hunter of his fiduciary duty to Shell, and the advantage he and his associates knowingly reaped therefrom is abundantly established. Appellants contend, however, that as to certain of the areas upon which trusts were impressed, e. g. areas not under Hunter's supervision as a geologist for Shell; areas which were proven or otherwise generally known to be favorable areas when Joncas purchased; areas in which Joncas could have secured the necessary geological data from others and was not beholden to Hunter for it; areas in which it had been previously announced that a test drill would be made; and areas in which Shell's information was only of the type known as "reconnaissance shooting" and therefore without substantial value, the proof is insufficient to establish a trust in favor of Shell.

The trial judge found the evidence "clear, convincing and trustworthy" as to the 59 areas upon which he imposed a trust in favor of plaintiff. We agree that as to these the evidence fully supports the finding that Hunter was an unfaithful fiduciary, that Joncas was a willing, knowing and active participant in Hunter's breach of duty, and that these two, as well as the other defendants who wrongfully profited thereby to the detriment of Shell, should disgorge their ill gotten gains. While some of these acquisitions, if found in circumstances more immaculate, might seem inherently innocuous, the sordid picture painted by this evidence as a whole imparts to them quite a different character.

The trial judge also found that the conveyance to Hunter by his associates of mineral interests in areas where plaintiff had no confidential information, was a consideration and an incentive to Hunter to disclose confidential information belonging to plaintiff as to other areas in which plaintiff, through Hunter, was possessed of such information. The evidence fully supports this conclusion.

The same may also be said as to the acquisition by Hunter from his associates of mineral interests in areas which were not under Hunter's supervision. These also would constitute an incentive, and would tend to induce Hunter to disclose information as to areas over which he did have supervision. Hunter had frequent and complete reports as to what was going on in other areas. All these circumstances blend into an impressive mosaic, which clearly reveals a studied, comprehensive and systematic scheme by Hunter and Jon-

cas, and others, to clandestinely purloin Shell's confidential information and divert it to their own gain, to Shell's consequent detriment.

Such activities are sometimes not susceptible of direct proof in all their ramifications. Like a conspiracy, they may be established by circumstantial evidence. What might ordinarily be an innocent circumstance when isolated, may assume color and significance from what has been established by direct evidence. Reynolds v. Whitin Mach. Works, 4 Cir., 167 F.2d 78, text 82; Fleishhacker v. Blum, 9 Cir., 109 F.2d 543, text 546. It was thus put by the Supreme Court in Wager v. Hall, 16 Wall. 584, 601, 83 U.S. 584, 601, 21 L.Ed. 504, 506: "All experience shows that positive proof of fraudulent acts * * * is not generally to be expected, and it is for that reason, among others, that the law allows in such controversies a resort to circumstances as the means of ascertaining the truth, and the rule of evidence is well settled that circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof * * *," a rule clearly applicable to the circumstances disclosed in this record.

But it is unnecessary to here rely upon circumstantial evidence alone. In a deposition taken in 1941, just after his discharge, Hunter himself stated that he had an agreement with Joncas to advise the latter generally where the "center of the play was," sometimes describing the outside limits and sometimes just the central portion, and would designate particular tracts by putting a circle on the map, or giving the name of the survey, or by checking it. Hunter also testified, however, that he was to give Joncas "information that in my (his) mind was not confidential information that the Shell might have; general information." But Hunter was to be the judge of what was, and what was not, Shell's confidential information. A fiduciary is allowed no such latitude with his principal's property.

There was also credible, and well corroborated, testimony that Joncas stated to a representative of another oil company that "I have a pipe line into the Shell Company, and sometimes I know about their business before they do." Used in this connection, the term "pipe line" means that a person has access to confidential information. The many and devious details of Hunter's and Joncas' activities absorb revealing color from this basic agreement between them. Their joint activities in mineral interests may well be interpreted in the light of these established facts.

It is unnecessary that plaintiff establish every transaction with separate, independent and isolated proof of the influence and effect of Hunter's information upon that particular transaction viewed *in vacuo*. It is enough that the circumstances, taken as a whole, constitute clear, convincing and trustworthy proof as to each tract. In determining whether there is sufficient evidence to support the trial judge's findings, this court will assume as established all facts that the evidence reasonably tends to prove, and will draw in appellee's favor all inferences fairly and reasonably deducible from these facts. Christie v. Callahan, 75 U.S.App.D.C. 133, 124 F.2d 825, 839; Rocona v. Atkinson, 9 Cir., 173 F.2d 661, 665; Traders & General Ins. Co. v. Powell, 8 Cir., 177 F.2d 660, 665. The fact that Hunter and Joncas were bent upon nefarious practices generally is so clearly established by the evidence, a strong duty is cast upon them to exculpate themselves as to any tracts that may be free from stigma.

Nor does this evidence, as contended by appellants, present a case of building inference upon inference in order to reach a conclusion, contrary to the rule in Texas and elsewhere. Compare, for example, Texas & N. O. R. Co. v. Burden, 146 Tex. 109, 203 S.W.2d 522. Rather is this a case for the application of the rule, recognized by this court, that multiple inferences may be drawn from one set of facts, as many separate inferences as there are facts to support them, although an inferred fact may not be used as a basis for a further inference, thereby extending a chain of inferences into the realm of pure conjecture. Travelers Ins. Co. v. Warrick,

5 Cir., 172 F.2d 516; Falstaff Brewing Corp. v. Thompson, 8 Cir., 101 F.2d 301, 305.

Viewing the evidence as a whole, the trial judge is well supported in his findings and judgment.

Affirmed.