SWAN, CLARK & Co. *v.* ROBINSON, Assignee, etc.

*(Circuit Court, D. Delaware.* January 11, 1881.)

1. BANKRUPT LAW OF 1867—PREFERENCE—" REASONABLE CAUSE TO BE-LIEVE."—The provisions of the bankrupt law of 1867 are applicable to all matters of fact constituting the act of bankruptcy, where they have transpired before the amendement of June 22, 1874. All that is necessary to establish under the original act is that the creditor accepting a preference had "reasonable cause to believe" the debtor to be insolvent, or acting in contemplation of insolvency, at the time of the taking of the said preference, and not that he had actual knowledge of such insolvency.

2. INSOLVENCY—INABILITY TO MEET DEBTS AS THEY MATURE IN THE OR-DINARY COURSE OF BUSINESS.—As the supreme court of the United States has decided in repeated instances that inability to meet debts as they mature in the ordinary course of business constitutes insolvency within the meaning of the bankrupt act, a creditor who holds unpaid protested paper of the bankrupt at the time he accepts a preference shall be presumed to have actual knowledge of the insolvency of the bankrupt; and any contract by which such preference is attempted to be secured is thereby made void.

3. PREFERENCE—TRANSFER OF STOCK—ADVANCES MADE BY CREDITOR.—Where the subject-matter of the transfer is shares of stock, the invalidity of the contract goes to the extent of the whole transfer; but while the transfer as such is totally void, the bankrupt estate shall not be permitted to retain moneys paid in by the creditor to increase the value of the stock, nor the actual advances made by him at the time of the transfer and upon the faith of the validity of the same, and which increased the assets of the bankrupt's estate, without accounting therefor.

In Bankruptcy.

Bill filed on the equity side of the circuit court November 20, 1877. Answer filed April 1, 1878. Answer of the Aid Loan filed the same date. Replication filed May 6, 1878.

BRADFORD, D. J. The facts proven in this case, as we think, are as follows:

Thomas J. Graves was adjudged an involuntary bankrupt on September 30, 1873. It is certain that during July, 1873, up to the fourth day of September, 1873, when he made his voluntary assignment for the benefit of his creditors, he was

much embarrassed in his pecuniary circumstances. He had not the means of paying his indebtedness as it matured, and struggled in vain to relieve himself from this pressure. Now, whatever may be thought the value of his real estate and personal property at this time, it was not available to give him any relief. On the first of August, 1873, Swan, Clark & Co., after having made inquiry, bought of Thomas J. Graves, the bankrupt, 20 shares of the Aid Loan Association, a building association incorporated under the laws of the state of Delaware, estimated and agreed upon by all parties to be worth at that time $2,126 in cash. This stock was paid for by an antecedent debt of about $1,388.04, $625 in cash, viz., complainants' checks for $425 and one Barlow's check for $200, and the further amount of $113 in goods sold and delivered to Graves. This stock formerly belonged to William Graves, the father of the bankrupt, and had been transferred after his decease by his executor to the bankrupt, and after having been pledged by William Graves for the payment of some $4,000 theretofore borrowed on mortgage by Thomas J. Graves, the bankrupt, from the Aid Loan Association. The stock was pledged as collateral security for the payment of the said mortgage, and the transfer of the same as collateral security was made to the said Aid Loan Association on the twenty-second of April, 1868.

On the first day of August, 1873, the complainants bought of the bankrupt the same 20 shares of stock thus pledged for the payment of the $4,000 borrowed by the bankrupt; and on the same day retransferred the said shares to the said Aid Loan Association as collateral security for the payment of the said mortgage, which transfer was in the following words, viz.: "Know all men by these presents, that we, Swan, Clark & Co., of the cities of Philadelphia and Chicago, in the states of Illinois and Pennsylvania, have hereby transferred, assigned, and set over to the Aid Loan Association all our right, title, and interest in and to 20 shares, 1 S., of the stock of a certain corporation of the state of Delaware, denominated the Aid Loan Association, located in the city of Wilmington, in

trust, that the said corporation shall have and hold the same as collateral security for the payment of a certain debt of $4,000, for which Thomas J. Graves and wife have executed to it a bond and mortgage; and in trust that the said corporation, its successors, and assigns will appropriate the value of said stock towards the payment of the said debt, interest, and fines, and for no other purpose whatsoever. Witness my hand and seal this first day of August, A. D. 1873. Signed and sealed by H. A. Clark, of the firm of Swan, Clark & Co., in the presence of George C. Maris and E. H. Gregg." This stock, according to the scheme in operation in such associations, matured and was fully paid up on the nineteenth of July, 1876, viz.: making each share of the said stock of the value of $200, and the aggregate value of the same,—20 shares,—$4,000. After the purchase of this stock by the complainants, they paid to the said corporation monthly dues on said stock, amounting, in all, to the sum of $620, and the said assignee of said bankrupt also paid on said stock other monthly dues for five months amounting to $100—the aggregate amount of $720 being the requisite sum to fully pay up the said shares until their maturity, as aforesaid, in July, 1876.

The assignee, during the whole time from the adjudication of bankruptcy to the nineteenth of July, 1876, (the date of the maturity of the stock, as aforesaid,) paid to the said corporation the interest on the said mortgage of $4,000, *i. e.,* $240 per year. The value of said shares thus paid up was on the nineteenth of July, 1876, applied to the payment of the mortgage aforesaid, and this mortgage was satisfied by the treasurer of the company against notice given and the protests of the complainants. This property, *i. e.,* the property on which the mortgage was given, was sold by an order of the district court made the twenty-ninth of September, 1876, by said assignee, for the sum of $15,000, clear of all liens and encumbrances, and the funds remain in the hands of the assignee to answer any claims which may be equitably preferred against them.

On these facts the complainants claim that the entry of satisfaction of the said mortgage was without authority of law and in violation of their rights as owners and pledgors of the said stock; *second*, that as said stock was pledged by said complainants as a further and additional security for the payment of the said $4,000 debt, the primary security for which was the mortgage aforesaid, it was the duty of said corporation to exhaust its remedy on said mortgage before resorting to the application of the said stock to the payment of said debt; *third*, that, upon the application of the said stock to the payment of the said $4,000 debt, the complainants were entitled to receive from the said corporation an assignment and transfer of the said bond and mortgage, and to be subrogated to all the said corporation's rights and interests in the same; *fourth*, that upon the state of the said mortgaged premises the complainants were entitled to receive from the fund in the hands of the assignee the said $4,000, with the interest on the same from the said nineteenth of July, 1876, less such payments as may have been made by said assignee for monthly dues on the said stock.

On the other hand, the defendant, the assignee of the bankrupt, claims—*First*, that there was no valid or legal sale of the said stock by said bankrupt to the complainants, because, by the terms of the transfer, all monthly dues paid in up to that time were only payments on account of the principal of the said mortgage, and that therefore the complainants did not acquire any right or title, either in law or equity, to the said 20 shares of stock, or any part thereof; *and, further*, that upon the said corporation applying the said stock to the payment of the principal of the said mortgage all sums due thereon became, and were, paid in full, extinguished, and discharged, and it became the duty of the said corporation to enter satisfaction on the record of the said mortgage, and to deliver up said bond and mortgage to the assignee.

The defendant further claims that the complainants, by reason of the terms of the said assignment and transfer of the said stock, are estopped from denying that the said stock

was not properly so appropriated; or that the said debt on bond and mortgage is not paid, extinguished, and discharged; or that said entry of satisfaction should be decreed to be void; or that said bond and mortgage should be assigned and delivered up to them; or that said mortgage should be decreed to be a lien upon said purchase money; or that any sum should be paid to them by this defendant by reason of any allegations in the bill contained.

The defendant further claims that on the first of August, 1873, the bankrupt, being insolvent, or in contemplation of insolvency, within four months before the filing of a petition in bankruptcy against him, with a view of giving a preference to the said complainants, did make an assignment of the said 20 shares of stock to them,—they, the said complainants receiving the said assignment, then having reasonable cause to believe the said Graves was then insolvent,—and that such assignment was made in fraud of the provisions of the bankrupt act, and that by reason thereof the said sale of stock was and is void; and, further, such alleged sale was not made in the usual and ordinary course of business of the said debtor, Thomas J. Graves; and also alleging that the complainants, having reasonable cause to believe the said bankrupt to be insolvent, or to be in contemplation of insolvency, by reason of the accceptance of the assignment as aforesaid, hindered and impeded the operation of the said bankrupt acts. This is substantially the defence of the assignee of the bankrupt.

The Aid Loan has put in an answer admitting the sale and facts as stated by the complainants, but denying that they ever acquired any right, title, or interest, in law or equity, in the said stock by reason of the transfer of Graves, the bankrupt, to them. The Aid Loan has no pecuniary interest in this suit; its mortgage is paid and satisfied; it has no claim on the shares of stock aforesaid whatever, and the case will be considered on bill of complainants, the answer of assignee, and testimony taken in the cause. It is proper to observe that this Aid Loan stock, the subject of the present

controversy, has a marketable value, and is as much the subject of purchase and sale as any other stock, and its ownership carries with it all the rights or obligations which attach to it by virtue of the rules and regulations of the said loan association, and there is no rule of law to make its purchase and sale an exception from that of any other stock.

Throwing aside, for the present, all questions which may arise under the bankrupt law, we think the sale of these 20 shares by the bankrupt to the complainants was valid, and gave them all the rights appertaining to such stock, after the payment of all fines and dues, as was consistent with the terms of the transfer to the incorporation as a collateral security for the payment of a debt. This court cannot admit the correctness of the position assumed by the defendant's solicitor, that no interest in this stock passed by the transfer to the complainants, on the ground that monthly dues were, by the terms of the collateral assignment, to be appropriated to the payment of the mortgage; for, had the corporation exercised the option of proceeding against the mortgaged premises,—the primary security for the payment of its debt, —and thereby released the stock, to whom could it be said that the stock belonged? Manifestly, to the party pledging it, and who had brought it to its maturity by the payment of its monthly dues, and not to a third party who had contributed no value toward its purchase. If the defendant's position be true, the Aid Loan, in such case, would be appropriating the money of a stranger to the payment of its own debt, without affording him the opportunity of recovering the money advanced by him for its benefit. The Aid Loan had the right to elect to proceed against either security for the payment of the sum of $4,000 secured by the bond and mortgage; and there was nothing in the terms of the pledge of the said stock as collateral security which impaired that right. Having chosen to rely on the fund pledged as collateral security, i. e., the stock, and having appropriated the same to that purpose, it became their duty to turn over to the owner of the stock the primary security, i. e., the mortgage, in order that

the security might avail himself of a remedy well settled in courts of equity of being subrogated to the rights of the principal creditor. In the judgment of this court the Aid Loan, without warrant of law, permitted this mortgage to be satisfied. But as this money arising from the appropriation of the shares of stock went to relieve the estate of the bankrupt from so much indebtedness, and the said real estate was afterwards sold by the order of this court, and the proceeds of the said sale are in the hands of the assignee, it is but just and equitable that this fund should be made answerable for the amount of indebtedness due the owners of these shares of stock, and involuntarily contributed to them to the benefit of the estate. So there is no difficulty in disposing of this case as far as regards the ownership of these shares of stock, and the rights of the parties in relation to them.

But the more serious questions for the consideration of the court are—*First,* is this purchase void *in toto* by reason of its infringement of the provisions of the bankrupt laws of the United States in force at the time of this contract; and, *second,* if not void *in toto,* how far void? This transfer of stock was made on the first day of August, 1873, and its validity or invalidity must be determined by the laws of the United States in force at that time. There is nothing in the enactment of June 22, 1874, to require any other construction of the bankrupt law of March, 1867, than that already given by the courts, and we must look to those decisions as to its real meaning, rather than to speculations as to what ought or ought not to be the degree of liberality with which a creditor's and debtor's conduct should be treated by the courts. This court thinks that the law of March 2, 1867, governs this case. Sections 5128, 5129, U. S. Rev. St. The inquiry, therefore, will be as to "reasonable cause to believe," (the words used in the act of 1867,) and not as to the actual knowledge, "that a fraud in the act was intended," as required by the amendment of June 22, 1874.

The leading case on this point is that of *Toof* v. *Martin,* 13 Wall. 40. This case gives a construction to the act of 1867

regarding "a reasonable cause to believe," and contains the following language: "The statute, to defeat the conveyances, does not require that the creditors should have had absolute knowledge on the point. * * * It only requires that they should have had reasonable cause to believe that such was the fact, and reasonable cause they must be considered to have had, when such a state of facts was brought to their notice in respect to the affairs and pecuniary condition of the bankrupts, as would have led prudent business men to the conclusion that they could not meet their obligations as they matured in the ordinary course of business." This case was followed by *Buchanan* v. *Smith*, 16 Wall. 308, and by *Dutcher* v. *Wright*, 94 U. S. 557, both supreme court cases, in which the same reasoning is followed in quite as strong language. In both of these cases, and in others, viz., *Merchants' Nat. Bank of Cincinnati* v. *Cook*, 95 U. S. 346, and *Wager* v. *Hall*, 16 Wall. 601, the supreme court have decided that inability to pay debts as they matured, in the ordinary course of business or daily transactions, constituted insolvency in the sense of the bankrupt act.

There are other decisions on the proper construction of the act of June 22, 1874, amending the bankrupt act, which, in the judgment of this court, do not govern this case, as the transactions show the subject of inquiry, as already intimated, occurred before the passage of that act. The amendment in question added to the words "reasonable cause to believe that the debtor was insolvent, and that such conveyance, etc., is made in fraud of the provisions of the said act," the following, viz., "and knew that a fraud in this act was intended." So that the evidence of knowledge, actual or constructive, was the subject of inquiry by the courts, instead of "reasonable cause to believe."

The case of *Grant* v. *First Nat. Bank of Monmouth*, 97 U. S. 80, has been cited by the complainants and commented upon at length. The main point of this decision is that "it is not enough that a creditor has some cause to suspect the insolvency of his debtor, but he must have such a knowledge of

facts as to induce a reasonable belief of his debtor's insolvency in order to invalidate a security taken for his debts."

This court sees nothing irreconcilable in these cases, when we take into consideration the degree of evidence decided to be sufficient to establish a knowledge of the facts within the meaning of the bankrupt law.

Thus in *In re Hauck & Co.* 17 N. B. R. 158, (commenting on the difference between constructive and actual knowledge,) the opinion proceeds: "Taking into consideration the adjudications under section 35 prior to said amendment, and the circumstances attendant on such amendment, I believe it to be more consonant with proper judicial construction to hold that said section as amended requires actual knowledge, as contradistinguished from constructive knowledge, to be shown. * * * * There can be no doubt, however, that actual knowledge may, under certain circumstances, be properly a matter of legal presumption; as, for instance, when the person receiving the alleged preference is shown to have actual notice of a state of facts in relation to the financial affairs of the bankrupt constituting in law a state of insolvency. Under such circumstances, actual knowledge would ordinarily and properly be inferred as a matter of legal presumption. This legal presumption rests upon the principle that every person must be held to intend the necessary and natural results of his own acts, as viewed under the law. Every one is presumed to know the law; and when a person enters into a transaction, the natural and necessary result of which is an infraction of the law, it becomes properly a matter of legal presumption that such person had actual knowledge of such unlawful result of his own act."

Under the law as laid down in this case, which met the approval of Judges Love and Dillon, (one a district and the other a circuit judge of the United States,) it is a serious question whether the complainants have not shown a case, which, if the circumstances had transpired subsequent to instead of before the amendment of 1874, would not have brought it within their decision as to evidence sufficient to establish actual instead of constructive knowledge. But this court does not

see the necessity of the application of the rule as to knowledge as required by the amendment.

Now, as to the question of fact, what is the evidence to show that Swan, Clark & Co., the creditors of the bankrupt, Graves, and the complainants in this cause, had, at the time of the transfer of the stock aforesaid, viz., first of August, 1873, and four months before the filing the petition in bankruptcy against Graves, "reasonable cause to believe said Graves was insolvent," and that "such transfer was made in fraud of the provisions of the bankrupt act."

1. In the mind of the court it is the result of the whole testimony (without going into detail) that Clark, one of the partners of the aforesaid firm, made himself thoroughly acquainted with the business affairs, embarrassments, and difficulties of Graves in the month of July, 1873, before the first of August of that year, the date of the transfer in question; and they, (the firm of Swan, Clark & Co.,) as a consequence, must be charged with and made responsible for Clark's knowledge on this subject.

2. It is not to be doubted from the testimony that Graves, during July, and at the time of the transfer of the stock in question, was insolvent within the meaning of the bankrupt law, in that he was entirely unable to pay his commercial indebtedness as it matured, and that Graves was fully acquainted with that fact.

3. The evidence shows that Clark was acquainted with the circumstances of the bankrupt, out of which arose his inability to pay his debts as they matured, and under the decisions of the supreme court must be treated as having presumptive knowledge of an intended fraud on the bankrupt act,—a condition of things not necessary, as before intimated, to be proven in the present case.

4. A presumption against the complainants arises from the fact that this transfer was not made in the ordinary course of the business transactions of the bankrupt, and that of itself is *prima facie* evidence of fraud. *In re Butler*, 4 B. R. 302.

Swan, Clark & Co. were manufacturers and dealers in fur-

niture, as was also the bankrupt; and in no sense can such a transfer of stock as aforesaid be said to have been in the bankrupt's ordinary course of business.

5. It will be noted that there is a current of decisions establishing the proposition that a debtor's inability to pay liabilities as they fall due in the course of business constitutes insolvency within the meaning of the bankrupt act, and, in the administration of this law by the courts, individuals must be held to knowledge of this fact. Now, in the present instance, the complainants had this actual knowledge brought home to them of insolvency; for they carried the protested paper of the bankrupt to the amount of $1,146.78, which fell due, the one note of $300 on the sixteenth of July, 1873, and the other of $846.78 on July 22, 1873, both of which remained in the hands of the complainants unpaid, and were part consideration for the sale and transfer of the stock aforesaid.

6. It is in evidence not only that Clark was in close consultation with Graves about his business difficulties and embarrassments for sometime prior to the said transfer, but that he agreed to a joint assignee for the benefit of all Graves' creditors, and acted as such subsequently to the first of August, 1873, under an assignment actually made. Now, while this assignment was made after the time of the transfer of stock, it was so near thereto that it may be taken as a strong fact to show the actual knowledge, and opportunities of knowledge, Clark had of Graves' affairs on the first of August, *i. e.,* the date of the transfer of the stock.

From these considerations, and others which might be adduced were it necessary, the court finds, as matter of fact, that the complainants, at the time they received the said transfer of stock, did have reasonable cause to believe Graves, the bankrupt, was insolvent, and that said transfer was made by the said Graves in fraud of the provisions of the bankrupt act.

It is sufficient, for the purpose of deciding this suit, to pass upon the proper construction of section 5128 as affecting this case, and the court will make no further inquiry as to how

far, if at all, the provisions of section 5129 have been violated.    If the transfer is made void by reason of the violation of one section, the case cannot be altered by showing that there was an additional violation of another.   How far, then, was this transfer void?.  In the opinion of this court it was totally void.   The act of congress makes it so.   We do not see how it can be considered in any other light.   This transfer of stock or contract is not divisible in its character; it is not separable as to the rights of different claimants under one instrument, which may be void as to one and valid as to others, as in the case in 3 Harrington's Rep. 117, (*Waters* v. *Comly*.)

Now, if this transfer was void, as a consequence, no rights under it passed to the complainants, and whatever value there was in the stock, as a matured scheme, still remained in the bankrupt.   Yet the complainants have equities in this case which should be protected by the courts.   To the maturing of this stock, which was used for the payment of $4,000 due on the mortgage aforesaid, the complainants made contribution, and it would be manifestly inequitable that the assignee of the bankrupt should retain the amount of the matured stock, and also the voluntary contributions of the complainants which contributed to bring the stock to the value of $4,000.   All the dues and fines paid by the complainants were just so much money received and appropriated by the loan society, and enured to the benefit of the bankrupt in paying off so much of the mortgage which was due from his estate, and which sum the complainants are entitled to have returned to them, together with interest thereon.   This sum amounts to $620 in the aggregate, having been paid by monthly instalments of $20 each, running through a period of 31 months.   They are also entitled to have returned to them with interest on the same, the sum of $738, being the amount of cash and goods paid and delivered by the complainants to the bankrupt, at the time of the transfer of the said stock, as part consideration therefor.

The court finds no difficulty in awarding interest on these

above-named sums, as they contributed to the aggregation of moneys which composed the sum of $4,000, and completed the scheme of the loan society. As the bankrupt received all the profits from that scheme, it is but equitable and just that those who contributed the money to produce this result should receive their advances, with interest on the same. Interest will be computed on the sum of $738 (advances as aforesaid) from August 1, 1873, and upon the sum of $620 the interest will be averaged in accordance with the time of payment.

Let a decree be prepared accordingly. As to the costs, we think it would be as nearly equitable as we can make it, that they should be divided, each party paying an equal portion of the same.