HAROLD G. SPENCER, as Trustee of M. Saiki, a Bank-
    rupt, *vs.* SANTOKI JIRO, and SAME *vs.* S. NEKE-
    MOTO.

### August 20, 1910.

*Insolvency—Voidable preference:*    Where a preference is given, the transaction is voidable by the trustee, if there are sufficient facts and circumstances having significance in reference to the debtor's financial condition, brought home to the preferred creditor or which he must or ought to have seen or known, to put him on inquiry which, followed up, would inform him of the insolvency.    B. A. sec. 60b.

*Bankruptcy—Transfer of property by debtor with intent to defraud:* The payment of a note by one within four months of the filing of a petition in bankruptcy against him and who is thereupon adjudged a bankrupt, with the intent to defraud other creditors, such note being dated more than four months before the beginning of such proceedings, is null and void as against such creditors, the payee not being a purchaser "in good faith and for a present fair consideration."    B. A. sec. 67e.

*Same—Same—Debtor's insolvency:*    Under the allegation that such payment was made with intent to hinder, delay and defraud the creditors of the one making it, proof of his insolvency at the time of the payment is not essential.

*Same—Intent to defraud—Transfer of property creating insolvency:* Any payment which creates insolvency in the payor, if made within four months of the filing of a petition in bankruptcy against him, which is followed by adjudication, except to a purchaser "in good faith and for a present fair consideration," would appear to be within B. A. sec. 67e.

*In Bankruptcy:*    Action by trustee to declare transfer of certain moneys null and void.

*Thompson, Clemons & Wilder,* Attorneys for Trustee.
*E. C. Peters,* Attorney for Defendant.

DOLE, J.    This is an action brought by the trustee in the bankrupt estate of M. Saiki, of Aiea, Oahu, for a decree declaring that the transfer of certain moneys by the bankrupt to the defendant be declared null and void, and that the defendant be held to account for such moneys.    It is alleged that such

payment was made within four months of the filing of the petition for adjudication and was intended by the bankrupt to, and did, create a preference in favor of said defendant and that the defendant at the time of such payment had reasonable cause to believe that the payment was made with the intention to make a preference in his favor. It is further alleged that the payment was made with the intent of the bankrupt and of said defendant to hinder, delay and defraud the creditors. Under these allegations, sections 60a, 60b, 67e and 70c of the bankrupt act appear to be applicable to the case.

It is perfectly obvious that so far as the bankrupt is concerned this payment was intended as a preference and was made with the intention of defrauding the other creditors. The bankrupt's conduct and statements in connection with this payment are such that the court can put little reliance upon his words under oath. In March or April he ran up his account with Hackfeld & Company to such an extent that their agent, Mr. Weight, remonstrated with him and on the first day of May, upon Saiki's promise to make large payments on account after the coming pay day of plantation laborers of the Honolulu Plantation, adjacent to Aiea, although believing that he was insolvent at that time, felt that it was politic to nurse him along and allowed some further credit in consideration of such promise. Upon a similar promise he obtained further credit from Peacock & Company on May 1st, both of which promises he failed to carry out. His business was in a bad way from about January or February of that year, one dealer after another withdrawing credit, and about the middle of the month of May, after these promises made to Hackfeld & Company and Peacock & Company, he paid out $2,736.00 to Japanese, some of whom were his neighbors and others laborers on the near-by Honolulu Plantation, who held promissory notes against him, all of them dated in 1907, and, with one exception, not drawing interest, and to one Honolulu creditor, Gonsalves & Company, $100.00, to another Honolulu creditor, a Japanese firm, Ide Manjudo, $50.50, and to the Aiea plantation store,

some forty dollars, and so exhausting his funds received from his Japanese debtors on pay day that he was compelled to say to Hackfeld & Company, upon their expostulating with him in the latter part of May, that he was unable to pay them anything on account of these payments to his countrymen, who, as he said, were going to Japan and had demanded payment. Upon his examination before the referee in bankruptcy he said that these Japanese creditors of Aiea and its neighborhood were pressing him hard and he paid them under such pressure. In the trial of this case he denied having made such statements and endeavored to show that there was no special pressure from them except a demand two or three months before, but that he had looked them up on his own account and paid them.

On Wednesday, January 26th of this year, Mr. Clemons, counsel in this case, in impeachment of his witness Kaya, testified that on January 22nd, 1910, at Aiea, the said Kaya, clerk of Saiki, told him that Saiki's business had been going bad from February, 1908, and that they could not fill orders because they could not get stock from the Honolulu wholesale dealers, and that Saiki after the first of May of that year was expecting to close out and was selling without renewing his stock. Two days later, presumably after Saiki had had an opportunity to instruct him on this point, Kaya, in open court, on his oath, denied making such statements and, said substantially, that up to May 13th the business was as usual and that there was always enough stock to fill out all the orders.

The whole story produces the irresistible impression that Saiki, finding that he was going under, obtained all further credit that he could, under promises that he did not intend to keep, and then took what funds he could collect from his debtors, the Japanese laborers, at pay day on the Honolulu Plantation, and turned it substantially over in full to his Japanese creditors, thereby defrauding his other creditors of their just proportion of his assets. This case is brought against Nekemoto, one of the transferees. If the transfer to him was made with the intent to defraud other creditors, it is null and

void as against such other creditors, unless he is a purchaser "in good faith and for a present fair consideration," which clearly he is not, under section 67e of the bankrupt act.

" The lawmaking power dealt with the subject of fraud in clause e of section 67 of the act, and, in language so plain, concise, exact and unequivocal as to leave no room for doubt or construction, there inhibited all transfers of the property of an insolvent debtor made within four months prior to the institution of bankruptcy proceedings under the act wherein the debtor, with the intent on his part of hindering, delaying or defrauding his creditors, parted with his property regardless of the knowledge of or participation in such fraud by the creditor,   *   *   *   'except as to purchasers in good faith and for a present fair consideration'." *Sherman v. Luckhardt,* 11 Am. B. R. 26, 30-31; *Friedman v. Verchofsky,* 105 Ill. App. 414, 423-424.

Under the allegation that the payment to Nekemoto was made with the intent to hinder, delay and defraud his creditors, proof of insolvency is not essential, under section 67e, covering this point, although insolvency would appear to be generally an existing condition where there is an attempt to defraud creditors.   Collier on Bankruptcy (5th ed.) 528. Under section 60, a and b, insolvency is a necessary condition. Although, as this case stands under section 67e, it may not be necessary to prove insolvency, yet, as referring to section 60, it is desirable to review that feature of the case.

There is no doubt in my mind that Saiki was insolvent along from about May 8th to the 18th, during which time the notes in question were paid to his countrymen, and that he believed himself to be insolvent.   His statement that his accounts amounted to $8,000 is his impression derived from his bookkeeper.   At his bankruptcy in July he returned his book accounts at $2,961.25.   His stock, claimed to be worth $2,400 or $2,500 in May, sold in June, after his store was closed, for $350.   An attempt was made to show that his book accounts were worth their alleged face value.   Although it is hard to appraise such accounts, which must be considered in relation

to a going concern (*Butler Paper Co. v. Goembel,* 143 Fed. Rep. 295, 297), yet it is very evident that with the business on a decline as his was in May,—his creditors refusing further credit,—the book accounts would not be worth as much as if the business were in a prosperous condition. Even if his story is true, that at that time he had accounts to the amount of $8,000, that in itself would show an unhealthy condition of his business in which he says the sales averaged $2,000 a month, and he was allowing long credits to his customers at the time that he himself was losing the confidence of those who had been supplying him with goods. From every standpoint, and taking the testimony of Mr. Buchly, these accounts could not be worth at that time any more than fifty per cent of their face value after pay day at the plantation, which was obviously the time the note holders were paid off, which valuation would show him to be in an insolvent condition, as his liabilities at that time were about $8,000, by his own statement, and his other assets only $2,400. Tr. p. 54. If he was not insolvent then, his payment of these notes made him so and would seem to have brought his case within bankrupt act, sec. 67e.

As to Nekemoto's relation to the conduct of the bankrupt, his testimony would show that he was ignorant of anything going wrong with the business of Saiki up to some time in June, probably the time when the store was closed by his creditors; that he believed him to be solvent when the note was paid to him; that he had no reason to suspect otherwise; that the condition of Saiki's store, even in June, had the usual prosperous appearance; that there were at least $2,000 worth of goods there then and at all times. And yet other witnesses tell of the appearance of the store showing a falling off of business. Rapozo says business fell off before May 15th and that he began to "fall down" in his payments about seven months before his bankruptcy, which was July 28th, 1908. Weight says the latter part of May things looked run down and Saiki was in a discouraged mood; Okubo says that while in February and March the condition of the store was good, in the early part of May

the goods were decreasing; Buchly says that Saiki had been shaky since July, 1907, and, in answer to a question as to what he meant, said, "I can not explain to you what credit is, but I can tell you whether a man is good or whether he is not good." Tr. pp. 179, 183, 184. And Santoki Jiro, one of the note holders who was paid the amount of his note, $630, on the 8th of May, and who is a defendant in a like case with Nekemoto, and therefore may be regarded as an interested witness in favor of Nekemoto, in answer to a question as to the assets of Saiki on the 8th of May, testified, "I know his stock in the store at that time was not like he used to have it." Tr. before clerk, p. 4. Other witnesses speak of the talk amongst the small population of the little village where the store was situated showing the interest in the failing affairs of Saiki's business, recognition that things were going wrong. Rapozo said that at the time Gonsalves & Company put their account against Saiki in the hands of a collector, the exact time not given, the people of that locality were saying that "he was going behind." Tr. p. 45. Nekemoto was a friend and neighbor of Saiki; assisted him in his preparation of notes. This same witness Rapozo testifies that in 1906 he and Nekemoto were in partnership, and Nekemoto told witness that Saiki was selling goods cheaper than they could afford to sell them, and upon their complaint to Peacock & Company, from whom both they and Saiki obtained their supplies, the matter was corrected. Tr. pp. 47, 49. If Nekemoto kept such close watch on his rival in 1906, was he not likely to do so in 1908? It is difficult to believe his word that he was unsuspicious of the condition of things. Certainly there was enough going on round him—enough talk to have warned him, and to have informed him of the condition of things,—at least to have put him on his inquiry.

"If it appears that the debtor was in fact insolvent as alleged, and that the means of knowledge were at hand, and that such facts and circumstances were known to the grantee as were clearly sufficient to put a person of ordinary prudence and dis-

cretion upon inquiry, it is well settled that it would be his duty to make all such reasonable inquiries to ascertain the true state of the case." *Wager v. Hall,* 83 U. S. 584, 601.

"Reasonable cause to believe that it was intended to give a preference does not require proof that the defendant had either actual knowledge or actual belief, but only such surrounding circumstances as would lead an ordinarily prudent business man to conclude that a preference was intended." *Sundheim v. Ridge Avenue Bank,* 138 Fed. Rep. 951, 953.

"One who suspects or ought to suspect, is bound to inquire, and the law presumes that he knows whatever inquiry would develop." (Against the principle of "notice.") 19 Yale Law Journal, 200; *In re John J. Coffey,* 19 Am. B. R. 148, 166; *In re Hines,* 16 Id. 495, 497.

According to the rule of such cases it would appear that Nekemoto had reasonable cause to suspect that Saiki's business was going to pieces. It is a circumstance requiring explanation, that if everything had been smooth sailing, as Nekemoto would have us believe, how it happened that these eight Japanese creditors, holders of notes, should all have come in, pressing him hard, as Saiki himself said before the referee in bankruptcy, and collected their notes between May 8th and May 18th inclusive, a period of eleven days,—notes signed at different periods of 1907—notes not due any more than they had ever been due, being notes on demand.

Defendant's objection to the admission of Exhibits B to G, both inclusive, is sustained.

Under these considerations, and with the showing made by the case, I have arrived at the following findings:

(1)  A preference was given by Saiki to the defendant through the payment to him of $500 on May 13th, 1908, in settlement of a promissory note dated in 1907 for that amount, which payment was within four months of the filing of the petition in bankruptcy against him, and at which time the said Saiki was insolvent. B. A., sec. 60a.

(2)   Such payment is voidable and collectible by the trustee, the defendant having had reasonable cause to believe that it was intended as a preference to him.   B. A., sec. 60b.

(3)   Such payment is null and void as against the creditors of the said Saiki, it having been made by him with intent to defraud his creditors within four months of the filing of petition in bankruptcy against him, and he having been there upon adjudged a bankrupt, and the defendant not being a purchaser in good faith and for a present fair consideration. B. A., sec. 67e.

Decree will be made accordingly.

In the case of Santoki Jiro, submitted herewith upon the evidence and law by agreement of counsel, there being no allegation that the payment to him was made with intent to hinder, delay and defraud the creditors, I find as follows:

(1)   A preference was given by Saiki to the defendant through the payment to him of $630 on May 8th, 1908, in settlement of a promissory note dated in 1907, for that amount, which payment was within four months of the filing of a petition in bankruptcy against him, and at which time the said Saiki was insolvent.

(2)   Such payment is voidable and collectible by the trustee, the defendant having had reasonable cause to believe that it was intended as a preference to him.

Decree will be made accordingly.