GREEN *vs.* TANTUM.

1. A creditor cannot file a bill to set aside a transfer of property fraudulently made by his debtor, until he has a judgment or execution such as would give a lien on that property, if not transferred.

2. At common law, a judgment or execution gave no lien upon the choses in action of the debtor, or debts due to him. But by the act of March 7th, 1850, to prevent fraudulent trusts and assignments, and the supplements to the chancery act, a creditor, upon the return of an execution, *nulla bona*, has a lien upon the choses in action of his debtor, and can maintain a suit to set aside a fraudulent assignment.

3. Although a purchaser of property transferred by a debtor to defraud his creditors, pay full consideration, and have no notice that the property is transferred to him for that purpose, yet if the circumstances are such from which he must have inferred that such was the object, the sale will be set aside, as against a creditor.

This cause was argued on final hearing, upon bill, answer, and proofs.

*Mr. Kingman,* for complainant.

*Mr. G. M. Robeson,* Attorney-General, for defendant, Joseph R. Tantum.

THE CHANCELLOR.

The complainant, on the 7th day of December, 1866, obtained a verdict for $2800 damages, at the Monmouth Circuit, in a suit pending in the Supreme Court, against the defendant, John A. Tantum. The suit was for a breach of promise of marriage. John A. Tantum had married Mrs Hartman, a widow, and was living with her at her own house, at Allentown. The verdict was delivered at ten in the evening. The same night, Tantum left Freehold, and on Saturday, the eighth, assignments of seven mortgages, held by him on lands in this state, to his brother, the defendant Joseph R. Tantum, were drawn, executed, and acknowledged

at Camden, in this state; on these mortgages there was due
$5250 principal, and some interest; and on the same day he
proceeded to the residence of his brother, the defendant Jo-
seph R. Tantum, at Wilmington, in the state of Delaware.
His brother was a practicing physician at Wilmington.   He
applied to his brother to purchase these mortgages and a
horse and buggy which he owned.   His Brother, Dr. Tan-
tum, agreed to purchase, and did purchase, the seven mort-
gages for the amount due on them, and the horse and buggy
for $350 in addition, and paid John A. Tantum the money
on Monday, the 10th of December.   No other property of
the defendant, John A. Tantum, is known within this state.
Since his going to Wilmington on the day after the verdict,
he has not been back to this state, openly.   His wife has
continued to reside at her residence at Allentown, and he
has continued to reside with his brother, Dr. Tantum, at
Wilmington, where the mortgages and horse and buggy
were taken just after the verdict.

   Judgment was entered on the verdict on the 14th day of
December, 1866.   On the same day, an execution against
goods and lands was issued to the sheriff of the county of
Monmouth, who, on the 31st day of the same month, returned
that no goods or lands of the defendant could be found in his
county.   On the 5th of February, 1867, the complainant
filed her bill against John A. Tantum and Joseph R. Tan-
tum, and the mortgagors in these seven mortgages, to have
the transfers declared void, as against her; to have a re-
ceiver appointed, and the money due on them applied to
the payment of her judgment; and to prevent the payment of
the money due on these mortgages to the defendants, John
A. Tantum, or Joseph R. Tantum.

   Joseph R. Tantum is the only defendant who has answered
the bill.   He admits the verdict and judgment, and the as-
signment of the mortgages and other property to him.   He
admits that his brother came to him with the assignments
executed on the 8th of December, 1866, at Wilmington, and
that he told him that the complainant had recovered a ver-

dict for near $3000 against him, before the assignments were delivered. But he denies that he had any knowledge that the object of the transfer was to delay or defraud the complainant in the recovery of her debt; and states that John told him that his object was to raise money to pay the complainant and his other creditors, after which he intended to leave New Jersey and enter into business elsewhere, and that he requested him, as a brother, to aid him by cashing these mortgages, and offered, as an inducement, to sell him some other property, being a horse and wagon, valued at $350; that for these mortgages and horse and wagon, which were also sold to him, he paid John $5503.16 in cash, on Monday, the 10th day of December, and that, on the same day, the assignments were sent to, and received at the office of the clerk of the county of Camden, for recording.

There is no direct proof that Dr. Tantum knew of any intention on part of his brother, by this assignment, to defraud the complainant. There is abundant proof that such was the object of his brother, and that he had openly avowed it before the verdict; but no part of this proof, directly, or by implication, connects Dr. Tantum with this design.

On the part of Dr. Tantum, both by the allegations in his answer, and by the argument of counsel, it is objected that the complainant can have no relief, because she had not, at the transfer, and has not now, any lien or claim upon these mortgages which will give her the right to question this transfer.

The position is, without doubt, correct, that a complainant cannot question in this court a transfer as fraudulent, unless he has some lien or claim upon the matter transferred, or is in such position that he would have such lien or claim, if it had not been transferred. This is held by Chancellor Williamson, in *Swayze* v. *Swayze et al.*, 1 *Stockt.* 280, cited in the argument, and also in *Young* v. *Frier, Ibid.* 465, in which case the Chancellor reviews, with great learning and research, the authorities on this subject. Of the correctness

of the position, there can be no doubt; the only question is, whether this case is within it.

At common law, and in New Jersey, until the supplement to the chancery act, approved March 20th, 1845, and the act to prevent fraudulent trusts and assignments, approved March 7th, 1850, a creditor, even after judgment, could obtain no lien upon the choses in action of his debtor; a judgment gave him a lien on lands, and an execution on chattels. And in order to entitle a creditor to question the fraudulent sale of lands or chattels, he was required to have a judgment or an execution that would have been a lien on property fraudulently transferred before they were obtained, if it had not been transferred.

In the present case, such lien might have been obtained by the complainant by an attachment against John A. Tantum, as an absconding debtor. This was not done. But she could likewise proceed to reach these mortgage debts by proceedings under the act of March 7th, 1850, or under the chancery act above referred to, and the supplement to it, approved April 12th, 1864. The bill in this case is filed for relief under the act of 1845, which gives a judgment creditor the right, upon the return of an execution unsatisfied, to file a bill in this court for a discovery of property or money due to the debtor, or held in trust for him, and to prevent the transfer of such property, or the payment of said money, and to have the same appropriated to the payment of the judgment. Upon the filing of this bill, the complainant acquired a lien upon all debts due to John A. Tantum, and all property held in trust for him, and, but for this transfer, these mortgages on property in this state, and the moneys due on them from residents of this state, would have been subjects of that lien, and could have been collected by a receiver, and appropriated to the payment of that judgment. And, in such case, the judgment creditor who first files such bill is held to have the first lien on such choses in action, in preference to a creditor by a prior judgment, who files a bill for discovery under this act, afterwards. The complainant,

Green *v.* Tantum.

then, has, as against these mortgages and mortgage debts, by the filing of her bill in this court, the same lien that she would have had by the entry of her judgment against lands of the defendant, alienated sixty days before the entry for the purpose of defrauding her out of her debt. The complainant has a standing in court to entitle her to question the *bona fides* of this transfer, and whether it was not done to delay or defeat her in the recovery of this debt.

It is not necessary to discuss here whether this transfer, not being of lands or chattels, comes within the provisions of the statute of frauds. At law that might be an important question, but courts of equity have jurisdiction in all cases of fraud, and have power to annul all fraudulent contracts and dealings. The removing property out of the jurisdiction of the court in which a suit is pending or about to be commenced, or assigning property with intent to defraud creditors, is, by statute, declared to be a fraud such as will take away the protection given in the constitution from imprisonment for debts arising out of contracts. If these mortgages were transferred by one of these defendants to the other, with the intent of defrauding the complainant, this court has jurisdiction to set aside the fraudulent transfer.

The question, then, to be decided is, whether this transfer to Dr. Tantum was fraudulent in such manner as to affect him.

If his brother intended fraud, and he was innocent of it, and paid the consideration for the transfers in good faith, without knowledge of such intent, his title cannot be injured by his brother's fraudulent intent. Joseph R. Tantum, in his answer, swears that he paid the full amount due on these mortgages, with about $350 allowed for the horse and wagon, amounting to the sum of $5503.16. His answer in this is directly responsive to the bill, is uncontradicted, and there are no circumstances in the case sufficient to overcome it; it must be taken as true.

The answer denies " the statement and charge of said bill, that he had full knowledge, or any knowledge, of the pur-

pose of the said John A. Tantum to defraud the complainant, and that he colluded with him to effect any fraudulent purpose." It also denies that the assignments were taken with any intent on his part of defrauding the complainant, or to prevent the collection of such judgment. This is a direct denial of the fraud on his part, or any knowledge of the frudulent intent of his brother in making the transfer.

But his answer admits knowledge of the pendency of the suit, and that he was informed by his brother of the verdict given on the 7th of December; that his brother came to his house on the 8th of December, with assignments executed and acknowledged, and these assignments were accepted and paid for, and sent to, and received at the clerk's office at Camden on the tenth.

The answer states that his brother applied to him for money, for the purpose of paying off this verdict and his other debts; in this it is not responsive, and is not supported by the proof. But it pleads and suggests a fact that, if believed, would be an excuse for his disregarding circumstances in the case which are insisted to be sufficient to give him warning of the fraud, without actual notice in words.

The real question is, whether the facts and circumstances in the case, admitted by his answer, and proved by other evidence, do not overcome the force of his answer denying any fraudulent intent on his part, or the knowledge of such intent on part of his brother.

It is easy to believe that the answer of Dr. Tantum is literally true, that he had no *knowledge* of any intent of his brother to defraud the complainant by that transfer. It is very probable that John did not go to a respectable, wealthy brother, saying, I want you to aid me in cheating Emma Green out of her verdict, now she has got it. He may have gone with the formal pretence set up in the answer, that he wanted to raise money to pay her; and yet, if the circumstances are such as must and ought to have aroused in Dr. Tantum's mind, in spite of the fact that the fraudulent intent was not announced and an honest purpose pretended, a con-

viction that the object was to delay the complainant, this answer should not protect him.

John was his brother—both men of property and standing, and on kindly terms. John had recently married Mrs. Hartman, and had been sued for a breach of a prior promise of marriage. The suit was stoutly contested, and its existence was known to Dr. Tantum; it must have attracted the attention of his family and brother, who could hardly avoid an interest in it. John, who had contested this to the utmost, when defeated, leaves Freehold after ten o'clock at night, passes through Allentown, is at Camden, and has the assignments prepared and executed there, and reaches the house of his brother, in Wilmington, the same day, and proposes the transfer. These facts must have been known to Joseph, and the knowledge of them is not denied. The negotiation is not for $3000, the amount of one of the mortgages sufficient to discharge that verdict, but for six other small mortgages, not needed for the purpose. It is for all the property of John A. Tantum, so far as appears, that could have been reached by proceedings in New Jersey. It included his horse and wagon, added for a small addition, if any addition at all, to the consideration. These were necessary to his personal comfort while at Allentown, but were carried immediately to Wilmington. It is scarcely credible that Dr. Tantum could have witnessed such hot haste on part of his brother—this desire and effort so instantly to get money to pay in full a claim of this nature, that until within a few hours he had fiercely contested, without suspecting, or without believing, that something else was intended than that which was avowed. Dr. Tantum had not the money; he had to borrow $4000, which he has since repaid from his earnings. Being compelled to borrow this at a few hours' notice, he would naturally be led to inquire and reflect upon what was the urgency of having all these mortgages cashed without delay, and without an opportunity for him to inquire into their validity and priority. The haste, too, in recording the assignments, which were in the clerk's office

in Camden on the same day that they were delivered at Wilmington, to which haste he must have been privy, is a suspicious circumstance.

The facts before Dr. Tantum at the time of this transaction, were such that they must have suggested to him, that the object of his brother was to do just what he has since done—to transfer all his property in New Jersey to some purchaser, for value actually paid over, before they were attached or seized in any way, so as to be beyond the reach of the complainant. This, although not knowledge in its strict or literal sense, so as to make his denial of knowledge of that intent perjury, yet is such notice of circumstances of suspicion that should have put him upon inquiry, as will deprive him, in a court of equity, of the character of a *bona fide* purchaser without notice. A person is to be charged with notice when he is acquainted with circumstances sufficient to convince a court or jury of the truth of the fact.

I cannot help believing that Dr. Tantum was convinced, in spite of any representations by his brother to the contrary, that his brother's object was to part with his securities and have his property in cash, so that he might avoid being compelled to pay the judgment of the complainant. This makes the transfer to him void, as against the complainant, and there must be a decree in accordance with this view.