Complainant seeks to set aside as fraudulent a certain assignment made by Ferd R. Patzowsky, hereinafter called Ferd, to his sister, Louise H. Ward, hereinafter called Ward.
 FACTS.
Complainant entered judgment against Ferd in the Supreme Court on August 16th, 1938, in the sum of $132,724.04, which represented the amount of the deficiency arising out of the foreclosure of a mortgage executed by Ferd to complainant on October 9th, 1930. The judgment was by confession on the bond accompanying the mortgage.
On August 29th, 1938, Ferd petitioned to open the judgment aforesaid and on December 14th, 1938, an order was entered in the Supreme Court denying the petition to open. In the interim, between the filing of the petition and the order thereon, complainant was, by the terms of the rule to show cause, restrained from any proceedings looking toward the enforcement of its judgment.
Ferd appealed from the order of the Supreme Court refusing to open the judgment, to the Court of Errors and Appeals, and that court, on May 15th, 1939, affirmed the Supreme Court.122 N.J. Law 482; 6 Atl. Rep. 2d 390.
During the litigation aforesaid and on November 19th, 1938, Ferd executed to his sister, Ward, the assignment herein questioned.
Ferd, in his answer, admits that he was insolvent on November 19th, 1938, and still is insolvent, but denies that his insolvency arose by reason of the November, 1938, assignment, asserting that he had previously assigned to his sister the subject-matter of the 1938 assignment as security for debts owing to her by Ferd.
Prior to the November, 1938, assignment, Ferd had made known to his sister, Ward, his financial straits, telling her of his difficulties in meeting demands of the Federal Reserve and R.F.C., as well as interest on complainant's mortgage, and as of December 20th, 1935, he was indebted to his sister in the sum of $1,500 for money loaned by her to him. On *Page 581 
December 20th, 1935, a written agreement was signed by Ferd and his sister. It recited that Ferd was indebted to her in the sum of $1,500 and that he desired a further credit, not to exceed $25,000, and also desired his sister to become an accommodation endorser on a $5,000 note, to be discounted for Ferd's benefit. To all of this Ward agreed, and as collateral security she took, as provided in the writing, 200 shares of American Car and Foundry seven per cent. preferred stock, seventy-five shares of Industrial Trust Co., Wilmington, Delaware, and 100 shares of United States Rubber Co. first preferred eight per cent. stock.
In addition to the collateral, Ferd also assigned to Ward as collateral security "all his right, title and interest in and to the estate whereof his father, Richard Patzowsky, deceased, died seized or possessed that he now or hereafter may claim, demand, own or be or become vested with or entitled to under or by virtue" of the trusts created in items 4, 5 and 6 of the last will and testament of Ferd's deceased father. It was further provided that on five days notice, Ward could sell the shares of stock and apply the proceeds to payment of Ferd's indebtedness to her, and also by the terms of said agreement, Ward was privileged to collect the proceeds of Ferd's interest in his father's estate, if and when payable, and apply the proceeds to indebtedness. In case of sale of the shares of stock or collection of the estate interest, Ferd was to have all balances of moneys over that necessary to satisfy his indebtedness to Ward.
After the execution of the 1935 contract, Mrs. Ward advanced to Ferd or to his wife or sons, at his request under the terms thereof, a sum which the evidence justifies me in finding to have been $20,654.33, for the payment of which Mrs. Ward still looked to the collateral aforesaid.
Thus things stood on November 19th, 1938, when Ferd and his sister executed the agreement of that date, which complainant seeks to set aside.
By the terms of the 1938 agreement, Mrs. Ward released to Ferd the stock collateral formerly held by her under the 1935 agreement. She released Ferd from any liability to repay the $20,654.33. She assumed payment of the $5,000 *Page 582 
note aforesaid, then reduced to $4,000, and Ferd delivered to her a note to his order (referred to as the Herman note) calling for the payment of $6,000, on which Mrs. Ward says she collected $3,500 in full settlement, and in addition, Ferd gave an absolute assignment of his interest in his father's estate to his sister. The total consideration for the 1938 agreement was $21,154.33, if we take the Herman note as of a value of $3,500, and if we also do not include advances made by Ward to Ferd subsequent to November 11th, 1938. If we add these advances, the evidence justifies a finding that Ward did advance to Ferd $9,307.46 after that time, which would make the total consideration $30,461.79. We will not discuss this additional sum at this time.
The evidence shows that the stocks released by Mrs. Ward had an approximate value of $23,000 as of November 11th, 1938.
The result of the 1938 agreement was that Ferd got this stock, which he sold; that he gave to his sister his only other available asset, the Herman note, and his interest in his father's estate. He admits he was absolutely insolvent but says the transfer of 1938 did not cause that condition. It certainly did not help it, and by it, the only assets available to complainant were put beyond the reach of execution, and before it, complainant would have had recourse to the shares of stock, the Herman note and Ferd's interest in his father's estate, subject to the prior lien of Mrs. Ward.
Before going further, that interest in his father's estate which Ferd assigned absolutely to his sister in 1938 should be in mind. By the father's will, three trusts were created, one in the sum of $75,000 in favor of testator's daughter, Antoinette Fleisch, one in the sum of $75,000 in favor of his daughter, Louise H. Fleisch (now the defendant Ward), and the third in the sum of $100,000 in favor of his daughter, Amelia C. Patzowsky. Each of these three trusts contained identical provisions that the income therefrom be paid to the named beneficiary for life, at her death, the corpus be paid to her issue, and if she should die without issue, or if any issue born should die before reaching the age of twenty-one years, the corpus should be paid to the defendant Ferd. *Page 583 
The trust in favor of Amelia further provided that if she should marry, there be paid to her immediately the sum of $25,000 out of the corpus of the $100,000 trust created for her.
At the time of the hearing, Amelia was fifty-six years of age and unmarried, Antoinette was fifty-nine years of age and a widow, and Mrs. Ward was fifty-eight years of age and a widow. All were in apparent good health, and there were no children born to any of the sisters.
The Fraudulent Conveyance act provides that a conveyance made by one who either is or will thereby become insolvent is fraudulent, without regard to actual intent, if the assignment was made without "a fair consideration."
Section 25:2-9 reads:
"Fair consideration. Fair consideration is given for property or obligation: a. When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied."
From the above it is seen that the statute, in defining "fair consideration" provides that to be fair it must be "a fair equivalent" for the property assigned, and "in good faith." The first question is, then, was the price of approximately $21,000 "a fair equivalent" for the assignment, and second, was the assignment "in good faith?"
As to the first question, I will again consider the consideration which passed between Ferd and Ward as not including the advances made by Ward after the date of the 1938 assignment, not at this time, however, determining whether or not those advances were made in pursuance of a verbal understanding between Ferd and Ward and not included in the written provision of the 1938 assignment.
Complainant offered no testimony to show the value of Ferd's remainder interest in the three trust estates created by his father's will. It did offer testimony to show the value of the assets of the three trust estates as of the time of the last accounting by the trustees in the Delaware courts which are administering the three trusts. This value was greater than the sum of $250,000 provided for in the three trusts.
The defendants offered two witnesses who testified as to *Page 584 
what they considered the market value of the remainder interest of Ferd and they fixed that value as of the date of the assignment at not more than $10,000. I do not accept the testimony of these witnesses as being conclusive evidence of the fair value of Ferd's interest in the life estates, aforesaid. These witnesses testified more from the standpoint of people engaged in the business of buying and selling interests in decedent estates, and the price paid by them, admittedly, is based sometimes on distress figures, and at all times on the lowest possible price at which the interests may be bought. Their testimony does not rise to the dignity of expert testimony which may be accepted as a guide for the court. On the other hand, their testimony does demonstrate the difficulty of ascertaining the value of Ferd's interest in the trust estates and of the many considerations that must be given in attempting to fix such a value.
It is true that the present value of the future interest of each one of the life tenants may be ascertained by resort to the usual methods adopted in such cases, and we find as a result of the application of those methods that the future expectancy of each one of the life tenants is a certain number of years and that the present value under those expectancies is a certain sum of money, but this does not take into consideration the contingency under which Ferd's interest in the trust funds may be lost, for instance, if any one of the three life tenants have a child or children born to them and that child or those children shall reach the age of twenty-one years, the principal becomes payable to such child or children, and the trust in favor of Amelia makes a like provision, except that should she marry, $25,000 of principal is immediately to be paid to her.
It is argued that Ferd has a vested interest in the remainders over the life estates, and that irrespective of whether he has such a vested interest or not, he is the residuary legatee under his father's will. But it must be remembered that the assignment by Ferd to Ward carried nothing other than an assignment of his rights under items 4, 5 and 6 of the will, and did not carry an assignment of his rights as residuary legatee. *Page 585 
The difficulty of determining the value of that which is assigned in the present case is the same as that which has confronted courts before, as will be demonstrated by a reading ofMoore v. Norristown Trust Co., 243 Fed. Rep. 931; Whelan v.Phillips, 151 Pa. 312, and Phillips Estate, 205 Pa. 511.
With the proofs as they are in this case, I am unable to determine that the consideration for the assignment from Ferd to Ward was not a fair equivalent for the assignment, and pass on to the question as to whether or not the assignment was made in good faith.
That Ferd desired to put his remaining assets beyond the reach of complainant's judgment and thus defeat collection thereon does not suffice to give complainant relief, but the proofs must go further and show that Ward participated in Ferd's scheme so to do. The mere fact that Ward knew of Ferd's intention to defeat complainant's efforts to collect on its judgment will not operate to defeat the assignment of 1938, unless Ward actually participated in Ferd's purpose by making a reservation for the benefit of Ferd or in some other manner combining with him to enable him to defeat complainant's collection of its judgment.Hersh v. Levinson Bros., Inc., 117 N.J. Eq. 131;174 Atl. Rep. 736.
The burden of establishing this combination between Ferd and his sister is on complainant and must be established by competent and satisfactory proof. Fraud will not be presumed and will not be found to exist if the opposite conclusion may be fairly drawn. All of the above are legal principles which are well established and must always govern. It is likewise well established that transactions of the kind here dealt with, when engaged in by brother and sister, are to be carefully and suspiciously scrutinized. But the fact that there is such a close family relationship does not prevent a bona fide preference as between brother and sister, and it is likewise well established that Ferd, being insolvent, had a right to prefer his sister and that she, acting honestly and in good faith, had a right to extinguish Ferd's indebtedness to her by accepting cash or other property for that purpose. But while Mrs. Ward had a right to protect herself, she had *Page 586 
no right to go further than necessary to serve that purpose.Atlantic Refining Co. v. Stokes, 77 N.J. Eq. 119;75 Atl. Rep. 445.
The question of good faith in the transfer of 1938 is one of fact and, as said in Wager v. Hall, 16 Wall. 584;21 L.Ed. 504:
"All experience shows that positive proof of fraudulent acts, between debtor and creditor, is not generally to be expected, and it is for that reason, among others, that the law allows in such controversies a resort to circumstances as the means of ascertaining the truth, and the rule of evidence is well settled that circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, especially when corroborated by moral coincidences, be sufficient to constitute conclusive proof, which is a rule clearly applicable to the facts and circumstances disclosed in this record."
The foregoing rule, it is seen, does not require direct proof of fraud, but permits a deduction thereof from proved facts and circumstances, and (as said in Tantum v. Green, 21 N.J. Eq. 364):
"If the facts and circumstances admitted by the answer, and in proof, show that this defendant must have known of the fraudulent intent of his brother, or if those facts and circumstances were such as to lead legitimately and naturally to the inference of fraudulent intent of the debtor, the assignments cannot, as against the complainant, stand. What a person knows may be locked up within his own breast; what he should know from a prior state of facts, is a conclusion of law. If a purchaser has before him facts which should put him on inquiry, it is equivalent to notice of the fact in question."
Of what facts was Mrs. Ward aware on November 18th, 1938? She knew of her brother's insolvency and had known of his financial straits from the date of the 1935 assignment. She knew of the foreclosure proceedings, the entry of judgment against Ferd, the proceedings looking toward relief from the judgment, the possibility of the judgment being sustained and, if so, the possibility that complainant would *Page 587 
levy on and sell the only remaining assets of her brother, which were then in her hands as collateral security for the payment of approximately $21,000 which Ferd at that time owed her. She knew that the value of the shares of stock held by her as collateral aforesaid, and Ferd's interest in his father's estate, also held by her as collateral, could be levied upon and sold, subject only to the payment to her of Ferd's indebtedness. She also knew, or is charged with knowledge, that if Ferd's interest in his father's estate was sold that his children and her nieces and nephews could never benefit by it; that it would be lost to Ferd and his family. Mrs. Ward knew that under the terms of the 1935 assignment she could, upon five days' notice, proceed against the collateral and by merely selling the stock securities receive full satisfaction of Ferd's then indebtedness to her, and must have also known that if she did so Ferd's interest in his father's estate would be freed to levy on complainant's judgment, as well as the Herman note of $6,000. There was no protective necessity for the execution of the 1938 assignment, in so far as Mrs. Ward's position stood at the time of its execution.
It would seem to me that the case comes within the decision of that line of cases of which Green v. Tantum, 19 N.J. Eq. 105;affirmed, 21 N.J. Eq. 364, is the leading authority, where full value is paid for property transferred to the grantee or vendee with knowledge that the grantor or vendor intends to make such disposition of the proceeds of sale as to put it beyond the reach of the creditor. In that case the purchaser of assets of his brother, under circumstances which the court considered fraudulent, denied that he had knowledge of any fraudulent intent on the part of the brother assignor, and the court said:
"If a purchaser has before him facts which should put him on inquiry, it is equivalent to notice of the fact in question, and where such fact constitutes a fraud on a third party, it will not protect the purchaser that he purchased for value."
That pronouncement of the Court of Errors and Appeals in 1869 is embodied in the Fraudulent Conveyance act, which requires, first, that there must be "a fair consideration" and that "a fair consideration" consists of two elements (a) "a *Page 588 
fair equivalent" for the property transferred and (b) "good faith." It matters not whether the fair equivalent be in cash or the satisfaction of an antecedent debt, but the transaction must also be found "to be in good faith."
The mere fact that Ferd and Mrs. Ward say that the transfer of 1938 was in good faith and without intent to hinder and delay and prevent complainant from collecting on its judgment does not make it so.
The circumstances attending the execution of the assignment of 1938 further indicates that Ferd and his sister had in mind placing all of Ferd's assets in safe-keeping, unharmed by prospective levies. They went to attorneys who had theretofore represented both Ferd and Ward, the same who had prepared the 1935 assignment and the same who had been and were conducting the litigation arising out of complainant's judgment, and who were, of course, fully cognizant of Ferd's plight, and even more so than Mrs. Ward, who admits that she was acquainted therewith. These attorneys also knew of Ward's security under the 1935 assignment. It was they who also drew the 1938 assignment and Ferd and Ward say that it was drawn from information furnished by the sister and brother. The relation between these attorneys and these clients was very intimate and had been for years, and yet both Mrs. Ward and Ferd say that there was a verbal understanding between them which they did not communicate to their attorneys and which was not inserted in the written agreement, to the effect that Ward was to advance further moneys to Ferd up to $30,000 as an additional consideration for the 1938 assignment, under which verbal agreement Ward claims to have advanced $9,000 and up. Ward says, in explanation of the attorneys not being advised as to this verbal agreement, that she "thought it was such a delicate matter, that it only exists between my brother and I, and I just took it that way." * * * "I was very much embarrassed. I did not want everything disclosed." Ferd's testimony was to like effect, and Mrs. Ward was very much confused as to whether this alleged verbal agreement was made before or after the execution of the 1938 assignment.
What it was in the so-called verbal understanding which *Page 589 
was more "intimate" as between sister and brother, or why it should have caused them "embarrassment" does not appear. When the 1935 agreement was executed it contained a provision for future advances up to $25,000 and there would be no apparent reason why the parties to the 1935 agreement should not have told their attorneys that there were to be future advances up to $30,000, especially in view of the fact that these same attorneys had drawn the 1935 agreement and were fully possessed, both then and at all times afterwards, with the facts of Ferd's financial difficulties and of his sister's extension of credit to him. There was not a detail unknown to them. Of course, if the attorneys had known of a secret understanding that the purpose of the 1938 assignment was to reserve for Ferd his interest in his father's estate, so that he could continue to realize money on it and at the same time hide his estate interest from his creditors, the attorneys would have advised against it. This is apparently what was done and its purpose is not even thinly veiled, and paraphrasing the language in the Green v. Tantum Case, supra, Mrs. Ward knew, or should have known that Ferd was not trading normally but, on the contrary, the purpose of the assignment, so far as Ferd was concerned, was to defraud his creditors, and as also said in that case, Mrs. Ward "is to be charged with notice when * * * acquainted with circumstances sufficient to convince a court or jury of the truth of the fact" and if Mrs. Ward did, in fact, fail to see the transaction as it would have presented itself to the ordinarily prudent person, the loss must fall on her and not on the complainant.
The result of this finding is that the property transferred by the assignment of 1938, in so far as it is now in existence, should be decreed to be free of any lien thereon of Mrs. Ward and should be controlled by the court through a receiver, appointed to the end that this remaining property, to wit, Ferd's interest in his father's estate, be applied to the payment or reduction of complainant's judgment, in accordance with the course followed inGreen v. Tantum, supra. *Page 590